Daniel **BERRIGAN** and Philip Berrigan, for themselves and as representatives of the class of all prisoners presently incarcerated in institutions maintained and operated by the Bureau of Prisons, Department of Justice of the United States Government, Plaintiffs,

v.

J. J. **NORTON**, Warden, Danbury Federal Correctional Institution, of the United States Bureau of Prisons, Norman Carlson, Director, United States Bureau of Prisons, John Mitchell, Attorney General of the United States, Defendants.

Civ. A. No. 14112.

United States District Court,
D. Connecticut.

Jan. 22, 1971.

Marjorie Gelb, Hartford, Conn., William C. Cunningham, S. J., William J. Bender, Center for Constitutional Rights, David Lubell, Lubell, Lubell, Fine & Schaap, New York City, for plaintiffs.

Stewart H. Jones, U. S. Atty., Barry J. Cutler, Richard L. Winter, Asst. U. S. Attys., Hartford, Conn., for defendants.

## RULING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

CLARIE, District Judge.

The petitioners, Daniel and Philip Berrigan, are serving sentences at the Federal Correctional Institution, in Danbury, Connecticut. Both have been convicted of separate federal crimes involving the mutilation of Government records, the destruction of Government property and interference with the administration of the Selective Service System, 18 U.S.C. §§ 1361, 2071(a) and 50 App. U.S.C. § 462(a). The petitioner, Daniel Berrigan, was sentenced to a prison term of three years and his brother, Philip, six years.

The plaintiffs' pending motions seek a preliminary injunction ordering the Warden of the Federal Correctional Institution at Danbury to immediately refrain from imposing any restraints upon them and other prisoners of their class from disseminating in writing or electronically their future expression of thoughts and ideas, subject to such constitutional restrictions, as the Court might determine to be necessary to protect any substantial or compelling Government interest. They further request that the Court restrain the Warden and the Bureau of Prisons from enforcing Policy Memorandum 7300.14,[1] insofar as it limits the plaintiffs' first amendment rights, as well as those of other members of their class, so that they could without restriction prepare and disseminate writings for publication outside the prison. The basis of their claim is that the present prison regulation is unconstitutional, because of its vagueness and overbreadth.

■ There has been no persuasive proof offered that these petitioners are suffering any irreparable harm under the present Policy Memorandum 7300.14 or any other prison rule affecting first amendment rights, nor has the Court been satisfied that there exists a strong

1. Plaintiffs' Exhibit # 2.

likelihood that they will ultimately prevail in the overall aspects of the relief sought. Therefore, a preliminary injunction granting immediate relief is denied; and the Court further finds that the essential requisites for a class action have not been proven and that phase of their motion is also denied.

So that the full thrust of the pending motions may be understood and evaluated in proper perspective, it is essential that the Court summarily review the factual nature of the criminal conduct of which both petitioners stand convicted. Such a background summary will more clearly disclose the factual setting, true nature and ultimate purpose of the remedies sought.

On October 26, 1967, Father Philip Berrigan and three others entered the offices of the Selective Service Board located in the Customs House at Baltimore, Maryland, and proceeded to mutilate official governmental documents, by pouring quantities of human and animal blood over them. (417 F.2d 1009–1011 (4th Cir. 1969)). On a separate occasion, May 17, 1968, his brother, Father Daniel Berrigan, with several other persons, entered a local Selective Service Board office in Catonsville, Maryland, and after removing several Government files from the office building to an adjoining parking lot, the group proceeded to unlawfully burn official Government records with what was described as homemade napalm. (417 F.2d 1002 (4th Cir. 1969)).

The subjective claims made at their original trials sought to justify their conduct as a symbolic protest against what they claimed was an immoral War in Vietnam. Their explanation was rejected by the courts and both men with their accomplices were convicted after separate jury trials and each was sentenced to prison. Their choice of conduct was not simply that of passive resistance to the laws of the civil government, rather they chose the deliberate commission of willful aggressive acts against their Government which were statutorily prohibited as criminal conduct. Their underlying trial philosophy advanced the thesis that under certain conditions, those who seek social changes have a moral right to commit illegal acts in order to challenge, resist and change, what they believe to be immoral political action on the part of their Government; and in this context that the end sought justified the means.

All parties concede that prior to the petitioners' incarceration, both plaintiffs had participated widely in political, secular and religious affairs. It is not in dispute that prior to their arrest and criminal conviction, they enjoyed all of the rights, privileges and immunities as guaranteed to free men under the first amendment to the Federal Constitution. They wrote, spoke, associated with others in actively petitioning the Government for the redress of what they believed to be pressing social and political wrongs of the day, and freely participated in the religious affairs of their church and respective religious orders.

Since they have been in prison, there has continued in existence certain option contracts with publishers,[2] wherein both plaintiffs had conditionally agreed to grant first options to publish any prospective book length manuscript which they might produce in the future.[3] Neither claims to have produced any writing for which publication has been denied under the challenged Policy Memorandum 7300.14[4]; nor has any request for permission to write such a manuscript ever been sought and denied pursuant to the procedures outlined in paragraph 4(a) and (b) of the aforesaid regulation, nor has any manuscript which they have written ever been confiscated under policy regulation.

The plaintiff, Daniel Berrigan, represented that he made a written request to Mr. Kelly, his prison social worker, for permission to write and disseminate

---

2. Plaintiffs' Exhibits # 1 and # 3.

3. Plaintiffs' Exhibit # 1.

4. Plaintiffs' Exhibit # 2.

a sermon outside the prison. (Tr. 69). About one week later, he claims he was told by Kelly that the Warden had refused his request. The matter never was in fact brought to the Warden's attention. Kelly testified that Father Daniel Berrigan did approach him concerning this matter and verbally said to him, "They are not going to let us write sermons, are they?" The latter replied, "I guess not or it seems not." Kelly considered the statement and the overall circumstances more in the nature of an acknowledgement by the petitioner that he was already fully cognizant of the general prison rule. (Tr. 277). Father Berrigan's testimony tends to confirm Kelly's version when he said, "(W)e had it in mind that the request would be turned down. And we also had in mind the necessity of a test case." (Tr. 73).

Since the testimony of Father Philip Berrigan relating to his being denied the same permission to prepare and disseminate a sermon outside the prison closely parallels that testified to by his brother, the Court will not reiterate the facts.

Background circumstances prior to this incident which have bearing upon veracity, disclose that Father Daniel Berrigan had been disciplined for having hidden three contraband letters in his shoe, which he had planned to smuggle out of the institution contrary to prison regulations. (Tr. 81). While he testified under oath that he had intended to get special permission from the social worker to send these letters, the factual evidence was to the contrary. When pressed on the permission issue he responded, "Sure, oh, yes, either before or after the fact." (Tr. 78). A contradiction in his testimony on this issue discloses duplicity and an absence of forthright truthfulness. This is confirmed further in a confiscated letter written by him to Robert Joselow of Baltimore, Maryland, wherein he said, "If you write please do not refer to this letter, which goes out through a friend." In a second letter to Isadore Katzowitz of Mohegan Lake, New York, he wrote, "So please do not refer to hav-

ing heard from me, if you should write." The third letter to Howard Zinn, of Newton, Massachusetts, stated:

"It seems to me in a sense that the long haul is under way. There will be a large variety of exposure open to us in the year ahead, from campus resistance to attacks on property, to underground, to jail, when that is inevitable." (Tr. 80).

"I do not want to be more specific at present—that would be inopportune, to say the least, but it would be, I think, of utmost importance that friends keep me on their horizon, as a presence at discussions, as someone who is on ice, but also an available resource." (Tr. 80-81).

"And I want alternatives kept open, which will in fact appear more clearly as the autumn comes on. But I know all friends will continue to draw closer, draw on one another, find ways to astonish, surprise, dismay, keep the powers off balance." (Tr. 81).

The sermon, which the plaintiffs represent they composed together, contained a passage urging their listeners to participate in a lawless action against their Government, in furtherance of a cause related to the crimes for which they were then serving criminal sentences. It said in part:

"It seems to us that the time for resistance has come, as surely as your lives and ours have been threatened by senseless obedience to senseless laws. It seems to us that communities must control Selective Service (by putting them out of business); they must encourage and harbor military deserters; they must refuse taxes that are war-related; they must withdraw from war industry and war profiteering. They must even think of destroying war ordnance and horror weapons, taking every precaution to protect human life. Finally, they must plan to bring the business of this nation to a halt, since nothing educates the mandarins like seeing their profits jeopardized." Exhibit 3, p. 6 of the Complaint).

## THE CLASS ACTION

■ The plaintiffs request this Court to treat their suit as a class action; and that their claims be considered representative of approximately 21,000 other committed federal prisoners who are detained in various prisons throughout the Country, pursuant to Rule 23, Fed.R.Civ. P. However, the personal circumstances of the plaintiff-prisoners are unique, considering their professional status as clergymen and writers. The average educational achievement level of the prisoners at Danbury alone average 6.5–7.0 grade level. (Tr. 206).

The Court takes judicial notice of the fact that various federal prisons and reformatories under the supervision of the Bureau of Prisons involve many different standards, types and classifications of custody. Penal rules must allow considerable flexibility in their administrative procedures, when applied to the various types of custodial care and security required. When a request for the certification of a representative class action is sought, the Court must consider the varied group detention problems, which require special custodial supervision in addition to the conduct of effective and meaningful rehabilitation programs.

The Court is cognizant of the fact that prison society by its very nature must be authoritarian in character. While there is a substantial percentage of normal inmates, there are many prisoners who are emotionally disturbed (neurotics); some are or have been drug dependent; still others have character disorders (psychopaths or sociopaths) with anti-social symptoms; a small percentage are borderline psychotics (mentally ill); and another substantial group comprise those who would rebel at any form of discipline, either inside the prison or out in a free society. In addition to such circumstances, the very act of incarceration itself naturally generates hostility toward their authoritarian custodians. It is little wonder then, that when these multiple dissimilar problem individuals are drawn together in such a setting, rules and regulations, in addition to being fair and clear, must be broad and flexible.

The unique status of these plaintiffs, with their priestly background and scholarly achievements, as successful authors of several books, does not on the present record bring either of them into focus as a realistic typical image symbolic of the rights, on the issues raised, for 21,000 other federal prisoners as a class.[5] A sufficient showing has not yet been made that the law or facts are common to or typical of those in the class which they would claim to represent.[6] *See*, Wilson v. Kelley, 294 F.Supp. 1005, 1010 (N.D.Ga.1968), (Three-Judge District Court).

## INJUNCTIVE RELIEF

The plaintiffs' counsel treat the freedom of speech and communication issues raised under their first amendment rights, as if these rights were to be measured by the same standards as those of free men, living outside prison walls in a free society; rather than in their real status as convicted federal prisoners.

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v.

---

5. Rule 23(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

6. From April 1969 to date there have been six requests for manuscript preparation (Tr. 197).
   Since the Warden's tenure, September 1970, no requests have been denied (Tr. 251) and no requests to prepare a manuscript under the existing policy regulation have come to him for decision. (Tr. 251).

Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

These plaintiffs must face the fact that they have temporarily forfeited many of the rights associated with free men during their period of commitment. The restrictive rules of prison conduct are not only designed to fulfill the objectives of physical restraint from further anti-social behavior, but also be an effective deterrent to future criminal conduct through an exposure to the undesirable aspects of prison life. Custodial security and control of many varied types of people under circumstances which involve an artificially forced close association and confinement requires rules which can effectively manage the institution.

"The principal problem of prison administration is the maintenance of discipline. * * * No romantic or sentimental view of constitutional rights or of religion should induce a court to interfere with the necessary disciplinary regime established by the prison officials. 'Except in extreme cases, the courts will not interfere with the conduct of a prison, with the enforcement of its rules and regulations, or its discipline,' Childs v. Pegelow, 321 F.2d 487, 489 (4th Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964) (citing many supporting cases). A prisoner has only such rights as can be exercised without impairing the requirements of prison discipline." Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir. 1964). See, Roberts v. Pepersack, 256 F.Supp. 415 (D.Md.1966).

"Restrictions on the extent and character of prisoners' correspondence and examination or censorship in relation thereto have always been regarded as inherent incidents in the conduct of penal institutions and the control of confinements, activities, preoccupations and other relationships therein.

"As to the justiciability of this and other elements of sentence-execution generally, it is settled doctrine that except in extreme cases the courts may not interfere with the conduct of a prison, with its regulations and their enforcement, or with its discipline." Lee v. Tahash, 352 F.2d 970, 971 (8th Cir. 1965).

The plaintiffs obviously have no constitutional right to deliver sermons in person outside the prison.[7] The free exercise of such a claimed right would be a contradiction of their legal status as inmates. Neither would they have any inherent constitutional right to make sound tape or video-tape recordings for such purpose. Stroud v. Swope, Warden, 187 F.2d 850 (9th Cir. 1951).

No bona fide effort has yet been made by either plaintiff to procure permission to prepare a writing or manuscript pursuant to challenged Policy Memorandum 7300.14; nor has any completed writing been presented for approval for publication outside the prison under said rule. See, Maas v. United States (re: Valachi manuscript) 125 U.S.App.D.C. 251, 371 F.2d 348 (1966). See also, "Right of Expression in Prison," 40 S.Cal.L.Rev. 407 (1967).

The Warden conceded that the rule in its present form lacked explicitness and was currently being revised by the Bureau of Prisons (Tr. 191) as indicated in proposed Policy Memorandum 7300.85. He explained that present procedures require that an inmate submit a form to the Supervisor of Education outlining what the inmate intends to write about. If this is approved, it is submitted to the Warden, who resubmits it to the Central Office of the Bureau of Prisons. (Tr. 211).[8] After final approval, it is required that the inmate execute an agreement which establishes the terms under which a manuscript may be used [9] and ultimately published; but correspondence with a publisher or literary

7. Plaintiffs' Exhibit # 4.

8. Plaintiffs' Exhibit # 2.

9. Defendants' Exhibit "B".

52

agent may not be carried on until these conditions have been met.

The petitioners have not made a bona fide attempt to submit a manuscript for approval under the existing Bureau of Prison rules. There has been no denial of communication with the courts or their attorneys and adequate alternative mediums of communication are available to them. The granting of the interim injunctive relief sought would not simply maintain the status quo, pending final disposition of the case; it would be tantamount to granting the relief sought. Injury to the public interest by the potential disruption of prison security and discipline would far outweigh any possible immediate injury to the petitioners. Maas v. United States, *supra*.

On the present state of the record, the Court finds that prison Policy Memorandum 7300.14, as promulgated September 7, 1966, is not unconstitutional on its face, and the Court denies the plaintiffs' motion for a preliminary injunction.

So ordered.