**Bobby SEALE and Ericka Huggins, Plaintiffs,**

v.

**John R. MANSON, Commissioner of Corrections of the State of Connecticut, et al., Defendants.**

**Civ. No. 14077.**

United States District Court,
D. Connecticut.

May 5, 1971.

Catherine G. Roraback, David N. Rosen, Michael Avery, New Haven, Conn., Stanley A. Bass, New York City, Charles R. Garry, San Francisco, Cal., for plaintiffs.

Robert K. Killian, Atty. Gen. and Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for Harold E. Hegstrom, Janet S. York, Henry Karney and Elizabeth Crouch.

Jerrold H. Barnett, Asst. State's Atty., New Haven, Conn., for Arnold Markle.

Stewart H. Jones, U. S. Atty., Peter A. Clark, Asst. U. S. Atty., New Haven, Conn., for Charles Weeks.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

The plaintiffs, presently being held without bond while on trial on serious criminal charges in the Connecticut Superior Court, instituted this civil rights action for injunctive and declaratory relief with respect to numerous conditions incident to their confinement. Federal jurisdiction is properly invoked pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(3). See Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Wright v. McMann, 387 F.2d 519 (2 Cir. 1967); Sostre v. McGinnis, 334 F.2d 906 (2 Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed. 2d 96 (1964); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970).

The plaintiff Bobby Seale is incarcerated in the Montville Correctional Center, and the plaintiff Ericka Huggins is an inmate in the Connecticut Correctional Institution for Women in Niantic. Both contend their federally protected rights are being violated by the following practices and conditions in the prison institutions:

1. Censorship of correspondence between the plaintiffs and their attorneys;

2. Restrictions on the type and amount of books, newspapers and other reading materials permitted to be sent to the plaintiffs;

3. Refusal to allow visitation rights to friends, potential trial witnesses, private doctors, and business associates;

4. Inadequate facilities for private consultations between plaintiffs and their attorneys;

5. Electronic eavesdropping;

6. Confiscation of private and personal writings;

7. Denial of access to members of the press;

8. Failure to transmit telephone messages between plaintiffs and their attorneys.

In addition, the plaintiff Seale challenges the validity of the rule prohibiting beards and goatees, and the plaintiff Huggins complains that the jewelry regulations are unreasonable.

On December 14 and 23, 1970, hearings were conducted before this Court, at which time the plaintiff Huggins and the Commissioner of the Connecticut Department of Corrections, Ellis MacDougall, testified. On December 24 the Court held a lengthy conference with counsel for the parties and Commissioner MacDougall. Throughout this day-long conference, counsel and the Commissioner demonstrated a commendable effort to settle their differences. As a result, most of the major issues were resolved, at least for the time being, by

the following agreements and stipulations:

1. The Commissioner would permit one private psychiatric evaluation session between Dr. Philip Shapiro and plaintiff Seale;

2. The Commissioner would recommend to the Council of Corrections, the rule making body for Connecticut prisons and jails, that all inmates be allowed to wear beards of reasonable length;

3. Mail between the plaintiffs and their attorneys would not be opened or censored by prison officials;

4. All reading materials, which counsel deem to be of direct or indirect assistance to the plaintiffs in the preparation and presentation of their cases, would be delivered to the plaintiffs;

5. The plaintiffs could receive and read the Black Panther Newspaper, on the condition that they would not give the newspaper to anyone in the general prison population;

6. The plaintiffs agreed to keep certain so-called "inflammatory" books and materials in their cells and not make them available to the other inmates;

7. Private writings of the plaintiffs concerning their defenses at trial would be kept in sealed envelopes, would not be opened or censored by prison officials, and, after a hand inspection, would be delivered to counsel;

8. Potential trial witnesses would be allowed visits with the plaintiffs;

9. The State's Attorney's Office would conduct an investigation to determine whether the secrecy of consultations between the plaintiffs and their attorneys was being invaded by electronic bugging or otherwise; and

10. Upon good faith representations of urgency, telephone communication would be permitted between the plaintiffs and their attorneys.

It was further agreed that the hearings should be resumed to enable the Court to hear evidence and rule on the validity of the regulations concerning jewelry, general reading material, mail and visits from friends, and press interviews.

On February 8, 1971, the Court was informed that all the agreements made on December 24 were ratified by the Council of Corrections, except the regulation concerning the wearing of beards by inmates. With respect to this regulation, the Council voted to leave the matter to the discretion of the Commissioner. Shortly thereafter Commissioner MacDougall resigned and Commissioner John Manson was appointed to replace him. The new Commissioner has decided that there should be no change in the regulation.

On February 10, 1971, the hearings were commenced again before this Court; thereafter, briefs were filed, and oral arguments were heard. On February 24, 1971, with the consent of all parties, the Court ordered, pursuant to Rule 65(a) (2), F.R.Civ.P., that there be a consolidation of the hearings on the preliminary injunction with the trial on the merits. The issues, not resolved at the conference on December 24, are now ripe for decision.

## I.

 On February 10, 1971, the Court *sua sponte* raised the question whether a three-judge court should be convened under the provisions of 28 U.S.C. § 2281. On February 18, 1971, the issue was argued by the parties and briefs were submitted. The Court is of the opinion that jurisdiction properly rests with a single judge since no state statute, statewide regulation, or order promulgated under a statute is involved in this case. See Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Vandygrift v. Home Rule Charter Commission, 425 F.2d 255 (5 Cir. 1970) (per curiam); Holmes v. New York City Housing Auth., 398 F.2d 262, 264 (2 Cir. 1968); McLucas v. Palmer, 309 F.Supp. 1353, 1357 (D.Conn.), aff'd, 427 F.2d 239 (2 Cir.), cert. denied, 399 U.S. 937, 90 S.Ct. 2271, 26 L.Ed.2d 808 (1970); Smith v. State Executive Committee of Dem. Party, 288 F.Supp. 371, 373 (N.D.

Ga.1968). The directives involved in this case were promulgated by the Council of Corrections pursuant to the general power granted to the Council to establish rules governing the administration of prisons. Conn.Gen.Stat. § 18–79. These directives were not issued to effectuate a specific statute and no state statute is attacked on constitutional grounds. Therefore, a single judge may consider the constitutionality of these directives and may, if required, issue an injunction against their enforcement. Cf. Berrigan v. Norton, 322 F.Supp. 46 (D.Conn.1971).

## II.

■ It is settled law that many rights exercised by ordinary citizens necessarily must be limited in a prison environment since "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Thus prison administrators must be granted considerable discretion in promulgating rules governing prison life and discipline. Long v. Parker, 390 F.2d 816, 820 (3 Cir. 1968); McCloskey v. State of Maryland, 337 F.2d 72, 74 (4 Cir. 1964); Brown v. State of South Carolina, 286 F.Supp. 998, 1001 (D.S.C. 1968); United States ex rel. Oakes v. Taylor, 274 F.Supp. 42, 43 (E.D.Pa. 1967); United States ex rel. Henson v. Myers, 244 F.Supp. 826, 827 (E.D.Pa. 1965). Courts lack the vast experience of prison officials and therefore, absent extreme circumstances, should not interfere with internal prison management or interpose their judgment with respect to rules and regulations on discipline and security.

■ On the other hand, a court should not be reluctant to strike down a prison regulation if it is unreasonable or arbitrary, Brooks v. Wainwright, 428 F.2d 652, 653 (5 Cir. 1970) (per curiam), or not reasonably related to the needs of penal administration. Pierce v. LaVal-

lee, 293 F.2d 233 (2 Cir. 1961). A prisoner does not lose all his fundamental rights because of and during his incarceration; the courts have rejected repeatedly the proposition "that upon entering a prison one is entirely bereft of all his civil rights and forfeits every protection of the law." Sewell v. Pegelow, 291 F.2d 196, 198 (4 Cir. 1961). Upon a proper showing, a court should examine a challenged prison regulation with respect to its purpose and the constitutional right which is affected. Gilmore v. Lynch, 319 F.Supp. 105, 109 (N.D.Cal.1970).

A test of this type permits the court to balance the need for the regulation against the claimed constitutional right asserted by the inmate and the degree to which it has been infringed by the regulation in question. See Gilmore v. Lynch, supra, at 109. Due weight, of course, must be given to the expert opinions proffered by prison administrators. In sum, the court must recognize the difficulties inherent in the administration of a prison community and must respect the need for restrictive regulations; yet, at the same time it must be solicitous of the civil and personal rights of the prisoner.

■ Of particular significance in this case, and a factor that weighs heavily on the scale, is that the plaintiffs are unconvicted detainees whom the law presumes innocent. Unlike convicted persons, the State's only asserted interest with respect to these inmates is to insure their appearance at trial, Davis v. Lindsay, 321 F.Supp. 1134, 1139 (S.D. N.Y.1970); any limitation on the fundamental rights of unconvicted persons must find justification in the legitimate advancement of that interest. Unconvicted detainees may be treated as convicts only to the extent the security, internal order, health, and discipline of the prison demand; considerations of rehabilitation, deterrence, or punishment are not material. Tyler v. Ciccone, 299 F.Supp. 684, 685, 687 (W.D.Mo.1969). See also Jones v. Wittenberg, 323 F. Supp. 93, 100 (N.D.Ohio 1971); Palmi-

giano v. Travisono, 317 F.Supp. 776 (D.R.I.1970).

Applying these principles, the issues pending before the Court will be considered *seriatim*.

### Seale's Beard

■ Prison Directive 2.21 of the Connecticut Department of Corrections reads as follows:

> Inmates may wear sideburns to the bottom of the earlobe. Muttonchops and flares will not be allowed. Hair should be neatly trimmed at all times. Beards and goatees will not be allowed, but mustaches may be worn if they follow the line of the upper lip and do not extend beyond the corner of the lip.

Upon his refusal to shave off his short ¼″ beard and goatee, Seale was placed in administrative segregation in the Connecticut Correctional Institution at Montville. He contends that, as an unconvicted detainee, Directive 2.21 cannot constitutionally be enforced against him. The Court agrees.

The threshold question presented is whether Seale has raised an issue which reaches constitutional dimensions, i. e., whether a citizen who is not incarcerated has a constitutional right to wear a beard and goatee. Most courts which have considered this issue have decided that an individual's head and facial hair style are not sufficiently communicative to warrant protection under the First Amendment, but do constitute a personal liberty which is protected under the Fourteenth Amendment. See, e. g., Richards v. Thurston, 424 F.2d 1281, 1283 (1 Cir. 1970); Breen v. Kahl, 419 F.2d 1034, 1036 (7 Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Crossen v. Fatsi, 309 F. Supp. 114, 116–117 (D.Conn.1970). Since a federally protected right has been established, the remaining issue concerns the reasonableness of a regulation which withdraws that right in the case of a state criminal defendant incarcerated in lieu of bail.

■ The only justification advanced by the defendants in support of the Directive was that beards and goatees are a potential health hazard in the spread of lice among the prisoners. Medical evidence was submitted in the form of a letter, dated December 4, 1968, from Dr. Franklin M. Foote, Commissioner of Health, which reads as follows:

> Beards and long hair constitute only a potential health hazard but not an actual one except when body lice, head lice or crab lice are present in the institution.

> If either the lice or nits are found on inmates there would be justification to require the man to be clean shaven and have closely trimmed hair because of the possibility that lice might transmit various diseases. However, during periods when no lice or nits are found by the medical personnel I believe it would be difficult to justify requiring all the inmates to be clean shaven.

However, there was no evidence that lice or other body vermin exists as a problem at the Montville jail.

Under these circumstances, it is the opinion of the Court that the Directive prohibiting beards and goatees cannot constitutionally be applied to Seale for the following reasons:

1. Seale has been placed in administrative segregation solely because of his violation of a prison rule which is not reasonably related to his status as an unconvicted detainee;

2. It is clear that Seale's goatee is not a health hazard; it is little more than a fringe around the mouth;

3. No problem of lice, nits, or other body vermin exists at the Montville jail or any other state institution;

4. Dr. Foote's medical opinion states that, absent the presence of lice or nits in the institution, "it would be difficult to justify requiring all of the inmates to be clean shaven;"

5. Former Commissioner MacDougall believed that there should not be a prohibition against all types of beards and goatees and, indeed, urged the Council

of Corrections to rescind the present Directive;

6. The defendants make no claim that a beard or goatee is a danger to security or that there exists a nexus between the Directive and the ever present need in a prison to make prompt and accurate identifications of inmates. Compare, e. g., Brooks' v. Wainwright, supra, 428 F.2d at 653; Brown v. Wainwright, 419 F.2d 1376 (5 Cir. 1970) (per curiam); Winsby v. Walsh, 321 F.Supp. 523 (C. D.Cal.1971); Blake v. Pryse, 315 F.Supp. 625 (D.Minn.1970).

This is not to say, however, that the defendants are prohibited from enacting a reasonable directive governing the length, width or style of a beard or goatee to insure desirable health objectives in a prison environment. Present rules regulate the length and shape of hair, sideburns and mustaches, and are unchallenged in these proceedings. It would appear that similar regulations with respect to beards and goatees could be promulgated and enforced by the same methods. Moreover, as Dr. Foote points out, in a situation where lice or other body vermin constitute a health hazard, emergency measures, including clean shaven faces, may well be required.

### Reading Materials

The plaintiffs contend their First Amendment rights are being violated by certain prison regulations restricting their access to and possession of reading materials of their choice.

Directive 2.22, dated September 1, 1970, states that:

(1) All incoming reading materials mailed directly to the inmate will be restricted (except for approved magazines sent directly from the publisher and educational material from correspondence courses.) Absolutely no reading material will be accepted from outside personal parties.

(2) A library committee will be appointed by Mr. Strain to read and evaluate questionable reading ma-

terial and make decisions as to their acceptance or rejection into our inmate book collections. Once the decision has been made, all Wardens, Superintendents and Suvising Captains will be notified. Any staff member receiving a book he feels falls within the framework of being *Inflammatory* or *Militant* will send this book to Mr. Strain for submission to the special library committee for *evaluation*.

In addition, the Council of Corrections issued a statement of policy entitled "Factors in Selection" which provides:

The Library will provide controversial works presenting different points of view, thus enabling inmates to make up their own minds about serious and important questions. Books which give a fair presentation of views and issues should not be excluded because of the race, nationality, or the political or religious views of the writer. However, these controversial works interpreted by the Department's Library Evaluation Committee to be unfair in their presentation and inflammatory to the extent that they advocate the overthrow or condemnation of any local, state, federal, or religious institution shall be reviewed critically. All questionable work that falls within this category should be submitted to the Department's Library Evaluation Committee for review.

Thus, reading matter may be excluded for two reasons: (1) the material is received from a prohibited source, or (2) the content is considered unacceptable. A prisoner may not receive a book from a private party or a publishing company. Any book that is sent to an inmate from a prohibited source is screened for content by the library committee and, if acceptable, is placed in the prison library. However, a personal subscription to a magazine sent directly from the publisher and educational material for a correspondence course are delivered directly to the prisoner after examination for contraband.

Commissioner Manson testified that the reason for the prohibited source rule is the fear "of contraband coming into the institution in personal copies of books from friends, relatives, family." Presumably, this is the reason for excluding books, but not magazines, which are mailed directly to the inmate from the publisher. No explanation was offered why books sent directly from a publisher pose a greater hazard than magazines and educational reading materials.

With respect to the content of the reading material, if a prison administrator believes a book is "inflammatory or militant," he refers the matter to the library committee for a critical review of the book and a determination whether the book may be placed in the prison library. Commissioner Manson testified that inflammatory books were excluded because they "wreak havoc in a correctional institution and take lives."

It is important to note that Commissioner Manson expressed "concern" over the present Directive and indicated that he disapproved of the practice of not permitting an inmate to retain for his private use an "acceptable" book sent directly to the inmate. The Commissioner further revealed that a new directive would be issued soon, the wording of which "would depend much on the way the Court guides us."

 It seems clear the present regulations governing reading materials leave much to be desired. An inmate has the constitutional right to read what he pleases and "[o]nly a compelling state interest centering around prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration can justify curtailment" of this constitutional right. Fortune Society v. McGinnis, 319 F. Supp. 901, 904 (S.D.N.Y.1970). See also Knuckles v. Prasse, 435 F.2d 1255 (3 Cir. 1970) (per curiam); Long v. Parker, 390 F.2d 816, 822 (3 Cir. 1968); Cooper v. Pate, 382 F.2d 518, 522 (7 Cir. 1967). The inmate's possession of reading materials may, of course, be preceded by a

careful examination to detect contraband, and considerations of space, sanitation and orderliness may require certain limitations which would otherwise be constitutionally offensive if an ordinary citizen were involved. Censorship or exclusion of certain reading materials would be justified upon a finding of a clear and present danger to prison morale, morality, discipline or security. In these matters, the expert opinions of prison officials are entitled to great weight and respect by the courts.

In the instant case, at the commencement of the proceedings, the plaintiffs submitted a rather impressive list of books, newspapers, and other reading materials to which they were denied access. However, by agreement of the parties, most if not all of the materials are now in the possession of the plaintiffs. It is difficult to determine from the record what, if any, reading materials the plaintiffs wish the Court to consider as a basis for a ruling. Under these circumstances, the appropriate course to follow is to allow Commissioner Manson the opportunity he requests to formulate and enact a new directive within a reasonable period of time. It may be that the entire issue, presently in a vague hypothetical form before the Court, will become moot.

*Jewelry and Clothing*

 Plaintiff Huggins complains that she is not permitted to wear all the jewelry she wishes and that the restrictions on dress are unreasonable.

Female pretrial detainees are allowed to wear a wristwatch, one pair of small earrings, a ring, and a necklace with a religious medal on it. The rule is enforced by a correctional officer's request that the inmate turn over any prohibited jewelry and, if the inmate refuses, the articles are removed from her room during her absence. Other rules govern the length of skirts and the type of material used in clothing worn within the institution or to court.

Even assuming that a constitutional right of personal liberty has been raised,

it appears these rules are a reasonable limitation on the exercise of that right. Testimony indicated that the regulations were enacted to prevent theft and to maintain the decorum of the institution. Judicial intervention is not warranted.

*Mail Correspondence and Visitation*

 Inmates may write to and receive mail and visits from members of their immediate families. These mail and visit privileges may be expanded under certain circumstances by the warden. The plaintiffs argue they have a constitutional right to correspond with and see friends and business associates. The Court disagrees.

Unfettered mail and visitation privileges will seriously hamper prison security and discipline. Limiting contact with the outside community to attorneys and members of the family is not unreasonable. This is especially true in the instant case since Mrs. Huggins may correspond with and receive visits from more than 15 persons. Seale has received fewer visitors, but on at least two occasions the warden has permitted non-family members and business associates to see him in prison. The evidence does not disclose a basis for federal court relief.

*Press Interviews*

 Finally, the plaintiffs contend they have a constitutional right to be interviewed in prison by members of the press. Directive 2.13, dated September 23, 1969, reads in pertinent part as follows:

I. All accredited members of the news media, bearing State Police press passes, will be allowed access to all Correctional Centers and institutions during regular business hours after first presenting credentials to either the Warden or officer in charge. In cases where news media wish access to the same after regular business hours, permission for such should be obtained from the Commissioner, Deputy Commissioner or Director —Public Information Office.

a. For security reasons and for the safety of reporters, it is necessary that an escort be provided at all times within the institution.

b. The staff, if they desire to do so, will not be prohibited from talking to reporters.

c. Reporters will not be permitted to talk to inmates without the express approval of the Commissioner of Correction.

On two occasions, reporters were denied permission to interview Seale in prison.

There is a serious question whether the plaintiffs have standing to raise this issue. In any event, the regulation is a reasonable one. The Directive allows reporters to gain access to a prison for stories on prison life and conditions. Permission of the Commissioner, however, is necessary before an inmate may be interviewed for the purpose of a personal story or news release. Prison officials believe that there must be a limitation on interviews of inmates by members of the press in order to avoid a prisoner gaining such notoriety that he becomes set apart and a "wheel" within the institution. This is a proper concern of prison institutional administration; judicial relief is not warranted.

Accordingly, for the reasons stated herein, the plaintiff Seale's claim that as an unconvicted inmate he is being held in administrative segregation in violation of his constitutional rights is sustained; in all other respects the plaintiffs are not entitled to any of the relief they have requested.