**Daniel BERRIGAN and Philip Berrigan, Plaintiffs-Appellants,**

v.

**J. J. NORTON, Warden, Danbury Federal Correctional Institution, United States Bureau of Prisons, et al., Defendants-Appellees.**

**No. 56, Docket 71-1383.**

United States Court of Appeals, Second Circuit.

Argued Sept. 27, 1971.

Decided Nov. 26, 1971.

\* \* \* \* \*

David G. Lubell, New York City (William J. Bender, William C. Cunningham, Stephen L. Fine, William M. Kunstler and Morton Stavis, New York City, and Marjorie Gelb, West Hartford, Conn., of counsel) for appellants.

Barry J. Cutler, Asst. U. S. Atty. (Stewart H. Jones, U. S. Atty., for the District of Connecticut, of counsel), for appellees.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is taken from the denial by District Judge Clarie of appellants' motion for a preliminary injunction in a suit involving first amendment and prison discipline questions.[1] Appellants are the well-known Roman Catholic priests who in autumn 1970 were confined in the Danbury, Connecticut, Federal Correctional Institution ("Danbury"), following their convictions in connection with the destruction of selective service records in Maryland during 1967 and 1968.

In late September 1970, various members of the clergy sent letters addressed to Warden J. J. Norton of Danbury, requesting that the Fathers Berrigan be allowed to make personal speaking appearances outside the prison on or around the times of the Feast of Assisi (Oct. 4) and Yom Kippur (Oct. 10). The letters asked that the priests be allowed to tape and send out their messages if personal appearances were impossible.[2] Between October 6 and 13

1. Berrigan v. Norton, 322 F.Supp. 46, 47–49 (D.Conn.1971). No appeal was taken from that portion of Judge Clarie's order which denied appellants' request to treat their suit as a class action. 322 F.Supp. at 50.

2. The letters were essentially the same in substance and concluded with references to freedom of speech and, in some instances, freedom of religion. One letter referred to a service scheduled for Friday, November 13, 1970.

the warden replied that both the requested personal appearances and tape recording transmittals were contrary to Bureau of Prison procedures.

Appellants had apparently drafted a sermon for delivery,[3] but did not seek permission from the warden directly to deliver it in any way or to publish it. Rather, sometime after October 12, 1970, appellant Daniel Berrigan asked his caseworker, "They are not going to let us write sermons, are they?" The caseworker's reply, which constituted the only alleged "official" action in this case, was "I guess not," or "It seems not." At no time during that conversation was there any indication that a particular sermon had already been written or that appellants wanted to disseminate it. The caseworker knew that a request or requests for personal appearances or tape recordings had been refused by Warden Norton. Appellant Daniel Berrigan did not show the caseworker the sermon he had prepared because, according to his testimony below, "I think we had it in mind that the request would be turned down. And we also had in mind the necessity of a test case."

Appellant Philip Berrigan testified that he submitted a copy of the sermon to his caseworker on October 10, 1970.[4] A day or two later the caseworker wrote him that if he would "care to discuss it,

please see me,"' but appellant did not pursue the matter further.

This suit was brought to enjoin Warden Norton from restraining appellants' dissemination of the particular sermon mentioned above, from in any way curtailing the exercise of appellants' first amendment rights, and from enforcing Bureau of Prisons "Policy Memorandum" 7300.14 on the subject of "Inmate Manuscripts," a memorandum which was in the process of revision when suit was brought and which, we are advised by the Government, has since been superseded by "Policy Statement" 7300.7A.[5]

We do not reach the constitutional questions presented in the complaint, nor do we in any way seek to determine what limitations, if any, those in charge of federal correctional facilities properly may place upon inmates' freedom of expression, in the interests of internal prison security or otherwise. Judicial review of issues of as grave importance as these cannot rest upon a record as incomplete as that before us.

The trial court found, and it is not disputed here, that the appellants did not submit "any completed writing * * * for approval for publication" outside the prison. Assuming that a copy of the sermon was given by appellant Philip Berrigan to his caseworker, there was no concurrent or later request

3. The sermon was reportedly published in the New York Times on December 14, 1970, after this litigation was commenced.

4. The transcript says:
   I submitted a cop-out [sic] to Mr. Fine on the same Sunday evening— the same date as when my brother submitted his to Mr. Kelly.
   We assume that Father Berrigan used the word "copy" in his testimony. However, a "cop-out" may be a request to see a case worker, in prison lingo.

5. Both policy memoranda require prior submission of manuscripts to the warden, subject to review by the Bureau, and set up standards for disapproval. The first memorandum states that a writing shall not be approved for publication if it deals with the life or criminal career of the writer or any other inmate, or if it is "libelous, lewd, obscene, or pornographic."

The later memorandum, on its face, further restricts the scope of inmates' free expression. It requires disapproval if the manuscript deals with the life history or the criminal career of the writer or that of any other person [as opposed to any other inmate in the earlier version], with matters presently in litigation, or "if the publication contains statements that are likely to have a detrimental effect on security or discipline." We do not hereby express approval of either statement as a matter of constitutional law, particularly in view of their generality and failure to specify standards for determining whether censorship of a letter or publication is reasonably and necessarily related to the purpose of incarceration. Parenthetically, however, the court sees nothing in the Berrigans' sermon that would be improper under either policy statement.

to the warden to disseminate it, although the caseworker had invited one of the appellants to discuss the matter with him. Consequently, publication or distribution of the manuscript has never been disapproved officially. The warden has never rejected the sermon for publication outside the prison, even though on cross-examination he did indicate reservations about one paragraph of the sermon. All that he has done is refuse requests by persons outside the prison to let appellants leave prison to speak, or, alternatively, to record on tape and send out a sermon or sermons of unspecified content.

Without having taken the necessary step of submitting the sermon to the warden, appellants ask us to construe the Bureau of Prisons Policy Memoranda as prohibiting the sermon in question, as void for indefiniteness, or to divine that publication of the sermon would not have been allowed by the warden. We have already said parenthetically (note 5 *supra*) that the Bureau of Prisons Policy Memoranda—both the original and the revised versions—on their face do not seem to prohibit dissemination of this sermon. While we are aware of the warden's testimony in the district court that he did not like or thought he "would have to object to" particular portions of one paragraph in the sermon [6]—which he read for the first time after the hearing below had begun—there is nothing in this record from which we can conclude with reasonable certainty that the sermon in question would have been rejected had it been submitted, or indeed that any request was made to the caseworkers to submit it to the appropriate prison authority for examination.

■■■ This being true, appellants have made an insufficient showing of any infringement of first amendment rights. And, at least from the present state of the record, the appellants do not appear to present a justiciable case or controversy. U.S.Const. art. III, § 2; Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *see also* Sanks v. Georgia, 401 U.S. 144, 151, 91 S.Ct. 593, 27 L.Ed.2d 741 (1971). Denial of the "extraordinary remedy" of preliminary relief, as a matter of judicial discretion, 7 Moore, Federal Practice ¶65.04, at 1625 (2d ed. 1966), is not improper where there is no "clear showing of probable success *and* possible irreparable injury." Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969) (emphasis original); Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968); Societe Comptoir De L'Indus., etc. v. Alexander's Dep't Stores, Inc., 299 F.2d 33, 35 (2d Cir. 1962); *see also* Maas v. United States, 125 U.S.App.D.C. 251, 371 F.2d 348 (1966).

Judgment denying preliminary injunction affirmed.

---

6. The paragraph that disturbed Warden Norton read:

> One last hard word—when does opposition to unjust law become the measure of a man, and therefore, a human, moral and political duty? It seems to us that the time for resistance has come, as surely as your lives and ours have been threatened by senseless obedience to senseless laws. It seems to us that communities must control Selective Service (by putting them out of business); they must encourage and harbor ■■■■■■ military deserters; they must refuse taxes that are war-related; they must withdraw from war industry and war profiteering. They must even think of destroying war ordnance and horror weapons, taking every precaution to protect human life. Finally, they must plan to bring the business of this nation to a halt, since nothing educates the mandarins like seeing their profits jeopardized. In a word, one must build the peace by first striking at the causes of war and making them peaceful.