**HOUSTON CHRONICLE PUBLISH-
ING COMPANY**

v.

**Richard G. KLEINDIENST et al.**

**Civ. A. No. 72–H–1657.**

United States District Court,
S. D. Texas,
Houston Division.

Aug. 24, 1973.

Robert J. King, Liddell, Sapp, Zivley & Brown, Houston, Tex., for plaintiff Houston Chronicle Publishing Co.

John B. Reese, Asst. Dist. Atty., Houston, Tex., for defendant C. V. "Buster" Kern.

Olney G. Wallis, Asst. U. S. Atty., Houston, Tex., for defendant Richard G. Kleindienst (now Elliot L. Richardson).

D. S. Tramonte, Jr., Tramonte & Tramonte, Galveston, Tex., for defendant J. B. Kline.

## MEMORANDUM AND ORDER

SINGLETON, District Judge.

This suit seeks declaratory and injunctive relief. Plaintiff, the Houston Chronicle Publishing Company [hereinafter referred to as "Chronicle"], has sued the Attorney General of the United States and, as his agents, M. F. Rousseau, U. S. Marshal for the Southern District of Texas, Jack Heard (substituted for C. V. "Buster" Kern), Sheriff, Harris County, Texas, and J. B. Kline, Sheriff, Galveston County, Texas [hereinafter referred to collectively as the "Government"]. Jurisdiction is founded on the first amendment to the United States Constitution, 28 U.S.C. § 1346 and 28 U.S.C. § 1361. Plaintiff alleges that the newspaper's right to gather news, the prisoners' right to speak, and the public's right to know have all been violated by an across-the-board denial of all interviews.

Plaintiff, through its city editor, sought interviews with two federal inmates. Sebastian Mirelez was being held in Houston in pretrial confinement on eight counts of income tax evasion. Ronnie Stewart was being held in Galveston in postconviction confinement so that he could testify as a Government witness in a pending federal criminal case under investigation. At the outset of the suit there was nothing in the record to indicate that these prisoners had expressed a desire not to be interviewed and some indication that Mr. Stewart wished to be interviewed. By the time the hearing was held the situation had changed. Mr. Stewart testified that he feared for his life and under no circumstances would he consent to an interview with the Chronicle or any other newspaper. Mr. Mirelez' sister testified that her brother did want to be interviewed. She exhibited a letter written by her brother to a Chronicle reporter and sent to her. The letter indicated that Mr. Mirelez desired to see the reporter. The newspaper was refused the interviews by the officials of both jail facilities.

Federal prisoners who are kept in the Harris County and Galveston County jails are held pursuant to contracts between the United States Bureau of Prisons (an agency of the Department of Justice) and each of the two counties.

The hardest of all the tasks confronting the court in this case was discovering what exactly the "rules" were and where these "rules" were to be found. All the witnesses called to testify about the rules and their operation seemed to agree that interviews with the press were a bad idea, but each had his own source. There are three potential sources for the "rules." First, there is Section 4 of "Exhibit A," attached to the contracts between the Bureau of Prisons and the respective jails. Exhibit A is a list of rules and regulations to be followed by the county jails in connection with the detention of federal prisoners. Second, there are the rules issued by Harris County Sheriff Jack Heard, governing press and television

interviews,[1] visits, and receipt of mail by the inmates of the Harris County detention facilities. Third, there is a policy statement of the Bureau of Prisons, No. 1220.1A issued February 11, 1972, which flatly forbids interviews with federal prisoners.

The connection between the contracts with the two jails and the "policy statement" was never made very clear and apparently was all but unknown to the persons faced with the question of whether or not to allow interviews.[2] It was apparent from the testimony of a representative from the Marshal's office that the personnel from that office and the jail personnel relied on the "rules of the Rehab Center." As used by the Marshal and the United States Attorney, this term referred not only to the directives of Sheriff Heard, but to the rules and regulations in Exhibit A. In Harris County, the procedure for federal prisoners is roughly as follows.

If, according to the Sheriff's directive entitled "Visitation of Inmates," a person is either an attorney or one of the persons on the list of five persons furnished to the jail by the inmates, then he may visit the inmate as a matter of course. If, however, the person is not on the list or is not an attorney, the Harris County jail officials will determine whether or not to allow the visit or will refer the person requesting a visit to the Federal Marshal's office. The Marshal then refers the question to the United States Attorney, apparently in an attempt to implement Section 4 of Exhibit A which reads as follows:

"Visits to federal prisoners shall be in accordance with the institution's prescribed rules. The rules should permit visits from identified members of the prisoner's family, his attorney, and, in the case of prisoners awaiting trial, persons with whom he may need to confer to prepare the defense of his case. Institution officials have the right to deny a visit to any prisoner when in their opinion such a visit would not be in the best interest of society or might endanger the security of the institution.

"If in the case of a prisoner awaiting trial or hearing the United States attorney considers that visits or communications from persons other than the prisoner's attorney are against the public interest and so advises the officials, such visits will not be permitted without the written approval of the United States marshal on each occasion."

The Federal Marshal who testified felt that Section 4 of Exhibit A would govern the situation and preclude visits by the newspapers, but he also indicated that some questions of whether or not to allow interviews might never reach the level of applying Section 4 because the county jail personnel might never call on the Marshal to decide the question of whether or not to allow or disallow the interview.

The United States Attorney testified that when he received telephone requests to visit inmates in the county facilities he would determine who was requesting the visit and if the person were an attorney, relative, or friend, he would con-

---

1. These were apparently not considered relevant to this case by the parties. They read, in part:

"News media and press members are welcomed into the Harris County Jail and Rehabilitation Center to discuss any problem or question. In the event of an occurrence or event that is felt to be of interest to any member of the news media, they will be contacted and be given the full details. This will be done without favoritism or partiality to certain news media.

\*   \*   \*   \*   \*

"In the event that an inmate's case or charge becomes of such interest to the public that it becomes necessary for the news media to interview him, all news media will be contacted and allowed to interview the individual simultaneously."

2. There was never any testimony concerning the procedures followed by Galveston County jail personnel and the rules of the sheriff of Galveston County, if there be any, were not put into evidence.

sult the rules of the Rehabilitation Center and "go along" with those. He stated that if the person telephoning desired a press interview, however, he would not allow one if the case were pending because he questioned the undue publicity which might be involved. He stated that he knew of no other rules.

The muddle was partially dissolved by the testimony of a representative of the Bureau of Prisons who stated that Section 4 of Exhibit A had to be interpreted in light of the policy statement numbered 1220.1A which states in paragraph 4(b)(6) that:

"Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, conversation may be permitted with inmates whose identity is not to be made public, if it is limited to the discussion of institutional facilities, programs and activities."

Exceptions to the rules are governed by paragraph 4(c) which provides that they are to be decided by the Director of the Bureau of Prisons. The facts set out above reveal the atmosphere of confusion and misunderstanding which has surrounded this case, especially the hearing held to determine the rules and their source. A situation in which rules in derogation of first amendment rights are utilized is serious enough, but a situation in which those persons who are given the authority to administer those rules are unfamiliar with the existence of all of them is as deplorable as it is ludicrous.

The representative from the United States Attorney's office testified that he was guided by "the rules of the Rehab Center." By this we have taken him to mean what was explained by another witness to be the visitation rules of the Sheriff's department interpreted in conjunction with the "Exhibit A" attachment to the contract. Exhibit A, Section 4, gave to the United States Attorney's office unlimited administrative discretion in deciding if a visit to a prisoner would be "against the public interest." A visit against the public interest would not then be allowed "without the written approval of the United States Marshal on each occasion." Presumably the United States Marshal would be following the order of the United States Attorney. Exhibit A further provides that the jail officials have unlimited discretion to deny visits when "in their opinion" a visit would "not be in the best interest of society or might endanger the security of the institution."

The court finds this unconstitutionally invalid on its face even though in the instant case the United States Attorney testified that he was prompted to refuse the interview because in pending criminal cases he always questioned the propriety of "undue publicity." No doubt he was prompted by sincere motives, but he was not being guided by any standards but his own; Section 4 gave him unlimited discretion to do whatever he saw fit. This court is not prepared to agree that the United States Attorney's office is properly charged with such complete discretion in matters so closely touching first amendment freedoms.

The representative from the Bureau of Prisons testified that the administrative discretion was not so far-reaching, because Section 4 was itself limited by the policy statement, paragraph 4(b)(6). That paragraph flatly refused to the press access to federal inmates for face-to-face interviews. In place of administrative discretion there is a far-reaching, emphatic rule, exceptions to which must be made by the Director of the Bureau. This court does not see the policy statement as any improvement, however, because it paints with too broad a brush. The Bureau of Prisons does not have to forbid all interviews in order to protect the interests which it seeks to protect.

The whole atmosphere of this area, at least as it exists in Harris County, is so pervaded with confusion as to what the

rules are exactly and who is to administer them that the court cannot countenance such a situation even though all action may have been taken with the best of intentions and in an effort to implement Rule 3 of the Local Rules of Civil Procedure. It is simply too easy, in the atmosphere which now exists, to abuse the first amendment in the name of Rule 3 or jail administration. The court does not mean to imply, however, that both Rule 3 and jail administration are not extremely important considerations.

Since the court finds that the language of the policy statement and the language of the contract make both facially unconstitutional, we will not delve any deeper into the application of the "rules" in this case.

Initially the defendants advocated the continuing enforcement of the restriction as a method of following Rule 3 of the Local Rules of Procedure for the Southern District of Texas. This rule is designed to prevent the trying of a case in a circus-like atmosphere, by forbidding lawyers to give out certain information about their pending cases to the press.

Since the hearing held on the merits, however, the defense has presented at the court's request additional theories of compelling state interest. The defendants contend that media persuasion could easily force unwilling inmates to grant interviews, especially since the inmates would be without the protection of his attorney while being "persuaded." The defendants further assert that information received under such conditions could degrade the prisoner and his family, give certain prisoners undue prominence, and compromise the prisoner's safety. Finally, the defense points out that the very fact of the inmate's imprisonment impairs his ability to discontinue an interview once the press has persuaded him to grant one.

This court has examined in turn each of the theories advanced as justification for the rule. The court finds that the interest defendant seeks to protect by enforcing the rule barring interviews can be protected by a less drastic restriction on the first amendment rights of plaintiff and those whom it represents.

## I. *Standing*

The Government has questioned the Chronicle's standing to assert its own first amendment rights and those of the prisoners in the Galveston County and Harris County jails.

Both plaintiff and defendant place much emphasis on the existence of the letter Mirelez sent to his sister requesting an interview. The Chronicle uses it to bolster its case for standing; the defendant attempts to discredit its validity in an attempt to defeat the Chronicle's standing.

The court has heard testimony that many inmates, when approached by a newspaper, will voluntarily grant interviews. Faced many times, as this court has been, with the desires of prisoners to freely voice their complaints, the court is compelled to believe this testimony. Because many inmates will freely grant interviews, the fact that two individuals who have been approached or who have approached the Chronicle do not now wish to be interviewed, is not controlling in this case in which the Chronicle has been denied access to *all* prisoners.

In this case the evidence shows that there is a rule which prohibits any newsman from interviewing any prisoner in federal custody; the Chronicle has been prohibited from interviewing any federal prisoner in the Harris County and Galveston County jails as a result of this rule; and that the Chronicle would be prohibited from conducting such interviews in the future.

Given this set of facts, the court concludes that the Chronicle falls within the test set out by the Supreme Court in Association of Data Processing Service Organization v. Camp, 397 U.S. 150, 152–153, 90 S.Ct. 827, 829–830, 25 L.Ed. 2d 184, 187–188 (1970): "The first

question is whether the plaintiff alleges that the challenged action has caused him injury in fact . . ." Here the Chronicle, a newspaper, is being prevented from gathering the news, an activity vital to its very existence. Further, the Court said:

> "The questions of standing . . . concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."

■ Certainly the first amendment as it has been interpreted was designed to protect the endeavors of newspapers. The court finds the Chronicle has standing to challenge the constitutionality of the rule barring interviews; and because it has shown past refusals and the possibility of future refusals, the Chronicle has standing even if it cannot show that any specific prisoner would be interviewed upon the granting of the requested injunction. Only if the Government had shown that there was no opportunity for interviews with prisoners because none desired to be interviewed could they defeat the Chronicle's standing, especially in light of the fact that the rules make it difficult for the Chronicle to even request an interview.[3]

Closely related to its assertion of its own rights is the Chronicle's assertion of the rights of the prisoners in the two jails. The prisoners have not been joined to this action as parties plaintiff, but the Chronicle contends that it may assert their rights here because of the fact that the two rights to interview and to be interviewed are so directly and basically interrelated. If the prison can forbid the prisoners to give interviews,

then any victory of the Chronicle here would be meaningless.

The Government cites us to the cases of Tileston v. Ullman, 318 U.S. 44, 63 S. Ct. 493, 87 L.Ed. 603 (1943), and Palmer v. Thompson, 391 F.2d 324 (5th Cir. 1967). These cases are not in point, however, because they are concerned with a situation in which the party plaintiff is himself either uninjured by the State's action or unprotected by the particular right asserted, yet seeks to assert the rights of third parties. The Chronicle case is, however, much closer to Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924) in which a private school whose existence was threatened by a state statute was allowed to challenge the constitutionality of the statute on its own behalf and on the behalf of its students and their parents. In that case and this we have a situation in which the party plaintiff has a very real injury and a clear constitutional right on which to sue, but the right is closely tied to the rights of individuals not party to the suit, who will be affected by the outcome of the suit.

In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, the court cited a number of cases, including *Pierce,* in which closely related rights of third parties were properly asserted in support of a plaintiff's challenge to unconstitutional statutes or actions. Because, "the rights of husband and wife, pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them" [doctor-patient], the court in *Griswold* found that the doctor could properly assert his patients' rights. The instant case fits into *Griswold* and *Pierce* exceptions to the general rule

---

3. There is some question about the freedom with which inmates may correspond with the press. The Policy Statement numbered 1220.-1A dated February 11, 1972, indicates that prisoners are to be allowed to correspond freely with the press; the undated directive from Sheriff Heard, titled "Mail Privileges, Harris County Detention Facilities" allows unrestricted correspondence; Mr. Mirelez' letter, however, indicates that, although he is allowed to correspond with persons not on his mailing list, he cannot receive mail from those not on the list.

that rights of third persons not parties to the suit are not properly asserted by the parties to a suit.

The Chronicle has standing to assert the rights of the prisoners in the Harris County and Galveston County jails to be interviewed. The Chronicle also has the standing to challenge the directives on the public's behalf. The rights of the public to know are so closely tied to the rights of the Chronicle and the rights of the prisoners that the Chronicle can assert those rights under the *Griswold* and *Pierce* cases.

## II.  *Rights of the Chronicle*

█ The Chronicle's right to seek out news is a part of its first amendment right to publish news. The Supreme Court has left little doubt of this fact:

> "We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out news, freedom of the press could be eviscerated." Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

The court in *Branzburg* went on to find that society's need for a properly functioning grand jury system weighed heavier in the balance than the "consequential but uncertain burden on newsgathering." The outcome of the *Branzburg* case, however, does not indicate, as the Government suggests, that newsgathering is not a substantial part of the publication process so jealously protected by the first amendment, interpreted by the Supreme Court in numerous decisions, including New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941), and Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

The Government makes much of the fact that, as *Branzburg* says:

> "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."

The instant case is not concerned, however, with information "not available to the public generally." *Branzburg* gave as examples situations in which it was necessary or proper to maintain secrecy, i.e., grand jury proceedings, Supreme Court proceedings, meetings of official bodies gathered in executive session, the meetings of private organizations, or situations in which there was some overriding governmental reasons for restricting the activities of private persons. It goes without saying that the general public is not allowed into jails; the security problems are obvious. But that fact does not compel the conclusion that the press should be categorically excluded from the jail, for the simple reason that certain members of the general public, to wit, friends, family, and attorneys, are for good reason allowed into jails for the purpose of seeing the inmates face-to-face. In the absence of a compelling State reason why the press should be excluded, the first amendment is good enough reason to allow the press into jails.

█ This court holds that the press has a first amendment right to gather information from jail inmates assuming those inmates desire to be interviewed.

## III.  *Rights of the Prisoners*

The Chronicle asserts for the prisoners incarcerated by the Federal Government in the jails of Harris and Galveston counties, the rights of those prisoners to free speech as guaranteed by the first amendment. Incarceration in any penal institution, be it prison or jail, necessarily results in the deprivation of certain constitutionally guaranteed rights, but the notion that the rights of prisoners can be trampled upon as the incarcerator sees fit has long since given way to the truism that "a prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443,

445 (6th Cir. 1944), cert. denied, 325 U. S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945). The language of the Fifth Circuit in Walker v. Blackwell, 411 F.2d 23, 24 (1969) suggests the general survival of the first amendment rights, whether of religion or speech:

"There is no doubt that the courts will scrutinize administrative action involving the constitutional claim of prisoners . . . who . . . claim a deprivation of the 'preferred' freedoms of the First Amendment."

The assertion of first amendment rights is especially poignant in the case of persons incarcerated in pretrial confinement who have not been convicted of any crime and, but for the lack of funds, would be able to give any interview they chose.

In a case concerning the sending of letters to the news media, the First Circuit, through Judge Coffin, expressed a sentiment which this court has previously adopted [cf. Guajardo v. Beto, 349 F. Supp. 211 (S.D.Tex.1972)].

"We need not adopt the broad principle that a prisoner retains all First Amendment rights to conclude, as we do, that he retains the right to send letters to the press concerning prison matters. In so concluding, we rely primarily on the fact that the condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, peculiarly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear. This does not depend upon a determination that wardens are unsympathetic to the need to improve prison conditions. But even a warden who pushes aggressively for reforms or larger appropriations within his department and before appropriate officials and legislative committees may understandably not feel it prudent to push for more public laundering of institutional linen." Nolan v. Fitzpatrick, 451 F.2d 545, 547–548 (1st Cir. 1971).

■ The difference between the face-to-face interview of a willing prisoner and correspondence by a prisoner with the press is significant only with regard to the administrative tasks of those in charge of the prisoners. The rights of expression involved are identical.

## IV. *Public Right to Know*

Closely tied to the rights of both prisoner and press is the right of the public to know, as Judge Coffin indicated, *supra.*

Justice Black in New York Times v. U. S., 403 U.S. 713, 91 S.Ct. 2140, 29 L. Ed.2d 822 (1971), gave a lucid exposition of the interconnection between the public's right to know, the freedom of the press, and the necessity for both.

"In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governor. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people."

The Supreme Court has very recently restated the fact of the right of the public to know in Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972): "It is now well established that the Constitution protects the right to receive information and ideas."

Especially in these times of jail and prison turmoil and unrest, it becomes even more important to see the interrelationships between the press' right to gather information, the prisoner's right to express himself, and the public's right to know, on the one hand, and the crea-

tive thought behind the guarantees of freedom promulgated in the Bill of Rights.

### V. Rule 3 of the Local Rules

█ Having come to the conclusion that the rights of the press, the prisoner, and the public have been burdened by the rule which forbids interviews of federal prisoners incarcerated in the jails of Harris and Galveston counties, we now come to the Government's contention that this burdening is only incidental to a valid purpose, unrelated to the free-speech aspects of the case. The Government has relied, *inter alia,* on the position that the rule is an attempt to implement Rule 3 of the Local Rules of the Southern District. Rule 3 reads in pertinent part:

"Rule 3. Release of Information by Attorneys.

"A. *In Criminal Cases.* It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which he or the firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

"B. *In Grand Jury Proceedings.* With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication, that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation.

"C. *After Arrest and Before Trial.* From the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, a lawyer or law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication, relating to that matter and concerning:

"(1) The prior criminal record (including arrests, indictments, or other charges of crime) or the character or reputation of the accused, except that the lawyer or law firm may make a factual statement of the accused's name, age, residence, occupation, and family status, and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his apprehension or to warn the public of any dangers he may present;

"(2) The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

"(3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

"(4) The identity, testimony, or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law;

"(5) The possibility of a plea of guilty to the offense charged or a lesser offense;

"(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

"The foregoing shall not be construed to preclude the lawyer or law firm

during this period, in the proper discharge of his or its official or professional obligations, from announcing the fact and circumstances of arrest (including time and place of arrest, resistance, pursuit, and use of weapons), the identity of the investigating and arresting officer or agency, and the length of the investigation; from making an announcement, at the time of seizure of any physical evidence other than a confession, admission or statement, which is limited to a description of the evidence seized; from disclosing the nature, substance, or test of the charge, including a brief description of the offense charged; from quoting or referring without comment to public records of the court in the case; from announcing the scheduling or result of any stage in the judicial process; from requesting assistance in obtaining evidence; or from announcing without further comment that the accused denies the charges made against him.

"D. *During Trial.* During the trial of any criminal matter, including the period of selection of the jury, no lawyer or law firm associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating to the trial or the parties or issues in the trial which a reasonable person would expect to be disseminated by means of public communication, except that the lawyer or law firm may quote from or refer without comment to public records of the court in the case.

"E. *After Trial, Before Sentencing.* After the completion of a trial or disposition without trial of any criminal matter, and prior to the imposition of sentence, a lawyer or law firm associated with the prosecution or defense shall refrain from making or authorizing any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication if there is a reasonable likelihood that such dissem-

ination will affect the imposition of sentence.

"F. *Special Circumstances.* Nothing in this Rule is intended to preclude the formulation or application of more restrictive rules relating to the release of information about juvenile or other offenders, to preclude the holding of hearings or the lawful issuance of reports by legislative, administrative, or investigative bodies, or to preclude any lawyer from replying to charges of misconduct that are publicly made against him."

The Government reasons that, since the Attorney General is an attorney, he is bound by Rule 3, and it is therefore his duty to keep prisoners under his care away from the occasion to place him in violation of Rule 3. It is true that prisoners have a right to a trial free from a circus-like atmosphere. The Government has cited us to several cases which hold that in certain special circumstances the right to free access to news sources may be curtailed in the interests of a fair and decorous trial.

Many courts, state and federal, have issued standing orders forbidding photographers at or near a trial. In varying contexts these rules have been challenged by photographers or their newspapers and have been, for the most part, upheld. Tribune Review Publishing Co. v. Thomas, 254 F.2d 883 (3d Cir. 1958), Seymour v. United States, 373 F.2d 629 (5th Cir. 1967), Dorfman v. Meiszner, 430 F.2d 558 (7th Cir. 1970). The *Dorfman* case, *supra,* did not question the propriety of such a rule, but struck down the rule for its overbreadth. Indeed, since the cases of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) and Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), there can be little question that the prevention of a circus-like atmosphere at trial is not only proper but necessary. It is a court's duty to do everything in its power to keep extraneous forces from prejudicing the rights of the parties to the lawsuit. A rule

against photographers in and around a courtroom is, however, a far cry from the blanket prohibition against all interviews which concerns us in the instant case. Rule 3 is a closely drawn, specifically worded rule. It does not speak to the question of whether or not an attorney can voice his opinion on jail conditions to newspaper reporters, yet the rule which bars all interviews does forbid this to the prisoners, who cannot speak out on jail conditions or, indeed, any subject at all.

The Government argues that there are four classes of prisoners:

(1) Pretrial confinement;

(2) Posttrial confinement;

  (a) Conviction final;

  (b) Conviction not final;

(3) Witness held in protective custody.

The two prisoners whom the Chronicle sought initially to interview fall respectively into categories (1) and (3), both categories being within the scope of Rule 3. The presentation of the Government's case does not obscure the fact, however, that Rule 3 does not forbid to prisoners all interviews on all subjects, but the Attorney General, through its agency the Bureau of Prisons, does.

This court finds it extremely difficult to see how such an all-prevailing prohibition against prisoner interviews could be derived from the narrowly-constructed, carefully-drawn language of Rule 3. The rule forbidding all interviews on all subjects go beyond the restriction contemplated by Rule 3.

### VII. *Other Reasons*

The Government contends further that the rule barring interviews is designed to protect the inmates from the press which might, if not restricted, compel him to grant an interview against his own interest and publish articles demeaning to a prisoner or his family.

This court finds it difficult to see how a person's incarceration has any bearing whatsoever on his ability to grant an interview or refuse one. Certainly, the valid restrictions placed on communication with persons in jail should decrease rather than increase the likelihood that the prison inmate will be compelled to grant an interview. The fact that a person is incarcerated does not lead to the conclusion that he has lost the ability to realize when the interview would be in his or his family's best interest and when it would not.

An official of the Bureau of Prisons testified that there were still other reasons, administrative in nature, why face-to-face interviews should not be allowed. In the first place, he contended, personal interviews give undue prominence to certain inmates and create an atmosphere not conducive to rehabilitation. While this argument might be persuasive in a case involving interviews in prison, it is out of place in a jail situation. Jails are not places of rehabilitation. Rather, they are places of temporary detention. The jail, unlike the prison, is in a constant state of flux. The inmate notorious one day is not so notorious the next simply because the fluid population has changed.

In a later portion of his testimony the prison official asserted that the confinement facilities of the Harris County and Galveston County jails are primarily temporary retention areas for federal prisoners. For that reason there is little or no opportunity to screen violent or dangerous inmates from those who are not violent or dangerous. Personal interviews, the expert felt, would, possibly, compromise the security of the institution and the safety of the members of the press. The court is not impressed by this argument. Members of the press are a notoriously brave breed. As for the safety of the institution, it is no more threatened by a press interview than it is by a visit from the inmate's family, friend, or lawyer. There has been no showing that the facilities of Harris or Galveston counties are particularly susceptible to breaches of security or conducive to dangerous unrest.

This court can see no compelling reason why the inmates of the Harris County and Galveston County jails, 65% of whom the Government's expert testified have not been convicted of the crime with which they are charged, should be restricted from face-to-face confrontation with the press, if they want it.

The Government takes the position that face-to-face interviews are but one means of obtaining news. It analogizes this newsgathering technique with the sound truck and quotes Kovacs v. Cooper, 336 U.S. 77, 88–89, 69 S.Ct. 448, 93 L.Ed. 513 (1949), implying that both face-to-face interviews and sound trucks are public nuisances. This court is asked by the Government to consider the necessity of face-to-face interviews in light of the alternative methods available to both press and prisoner. The federal prisons have a policy of allowing the press to visit the prisons and correspond with inmates. The inmates are permitted to visit with other people—family, friends, lawyers—and to correspond with judges and congressmen.

The Chronicle, however, presented testimony strongly persuasive to a conclusion that the face-to-face interview is not just another method of communication. Two experienced newsmen and two university journalism professors testified that it is basic and essential to newsgathering in many contexts. Newsmen, like lawyers and judges, need to size up those from whom they receive information and the face-to-face interview is the most important technique of doing so. The court is compelled to believe the Chronicle's experts on the question of the necessity of face-to-face interview.

## VIII. *Conclusion*

When all is said and done, what remains is a case of prior restriction on the press' right to publish, the prisoner's right to speak out, and the public's right to know. The Supreme Court has said in Bantam Books v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963): "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its Constitutional validity." Had the rule forbidding interviews fallen more in line with the letter and the spirit of Rule 3, there is little doubt that this court would have upheld those directives since the rights of a prisoner to a fair and decorous trial has always outweighed the incidental burden on newsgathering it might cause. *Cf. Estes, Sheppard, Tribune, Seymour,* and *Dorfman,* all cited above.

Had the rules been closely drawn to protect the inmate from his own lack of discretion, the jailers from an undue burden of administration, or the jails and the press from threats to security or safety, this court would almost certainly have upheld them, since the Fifth Circuit has held that internal prison management is not ordinarily a function of the courts. *Cf.* Gardner v. Joyce [slip opinion No. 73–1452, July 25, 1973] and cases cited therein.

Given, however, the breadth and far-reaching effect of the policy statement of the Bureau of Prisons as well as the unbridled discretion in this area granted to the United States Attorney's office and to the jail officials by virtue of paragraph 4 of Exhibit A attached to the contracts relating to federal use of the Harris County and Galveston County jails, this court is compelled to strike down these rules as unconstitutional. The Supreme Court has spoken time and time again to the necessity for precise regulation in the first amendment area: "It has become axiomatic that '[p]recision of regulation must be the touchstone in the area so closely touching our most precious freedoms.'" United States v. Robel, 389 U.S. 258, 265, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967). And again, most recently in Police Dept. v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212, 220 (1972): "Statutes affecting First Amendment interests [must] be narrowly tailored to their legitimate objectives." Judge Tut-

tle speaking for the Fifth Circuit has expressed the proposition in this way:

". . . [in the area of first amendment freedoms] we have pointed out that stringent standards are to be applied to governmental restrictions . . . and rigid scrutiny must be brought to bear on the justifications for encroachments on such rights. The State must strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement . . .; and in the absence of such compelling justification the state restrictions are impermissible infringements of these fundamental and preferred rights.

"Moreover, in examining the justification for state infringement [in the area of first amendment freedoms] . . . the Supreme Court has recognized and declared the principle that the means utilized by the state, as well as the ends, must be legitimate. Even the most legitimate of legislative ends cannot justify the enforcement of fundamental rights of individual citizens if these ends may be accomplished by the use of less restrictive alternative means which result in less invasion of these fundamental rights." Jackson v. Godwin, 400 F.2d 529, 541 (5th Cir. 1968).

This court does not see how these vague and overbroad rules which flaunt first amendment freedoms and constitute a prior restraint could possibly be justified by legitimate, overriding governmental objectives which could not be produced by narrow and precisely drawn directives.

The Seventh Circuit has admirably summed up this court's opinion in a case involving photographs in the courthouse:

"Our disagreement with the Government's argument is not that a court is powerless to protect the participants and proceedings from immediate harassment from the press, but that

Rule 34, which seeks to accomplish that concededly legitimate goal, is overbroad and, in effect, prohibits conduct which does not threaten to disrupt judicial process, as well as that which does." Dorfman v. Meizher, 430 F.2d 558, 562 (7th Cir. 1970).

Accordingly, this court declares those parts of the policy statement of the Bureau of Prisons and Exhibit A attached to the contracts between the Bureau of Prisons and Harris County and Galveston County which forbid all face-to-face interviews with federal inmates in the jails of those counties constitutionally invalid and void. The court further enjoins all defendants herein, together with their agents and deputies, from further enforcing such rules. The court feels that unlicensed access to the jails would be both prejudicial to the inmates and administratively unfeasible and, therefore, encourages the promulgation of new rules and regulations consistent with this court's opinion and final judgment. Any such new rules and regulations should also be compatible with the letter and spirit of Rule 3 of the Local Rules of the Southern District of Texas.