**The WASHINGTON POST CO., and Ben Bagdikian, Plaintiffs,**

**v.**

**Richard G. KLEINDIENST, and Norman A. Carlson, Defendants.**

**Civ. A. No. 467–72.**

United States District Court, District of Columbia.

Dec. 19, 1972.

Joseph A. Califano, Jr., Charles H. Wilson, Jr., Richard M. Cooper, Wil-

liams, Connolly & Califano, Washington, D. C., for plaintiffs.

Joseph Hannon, Michael A. Katz, Asst. U. S. Attys., Washington, D. C., for defendants.

## SUPPLEMENTAL MEMORANDUM

GESELL, District Judge.

The additional evidentiary hearings ordered by the United States Court of Appeals for the District of Columbia Circuit, 477 F.2d 1168, have reinforced this Court's previously stated views as to both the facts and the law.

At the supplementary hearings, testimony was taken over a two-day period from Arthur L. Liman, General Counsel of the New York State Special Commission on Attica; Roy M. Fisher, Dean of the School of Journalism, University of Missouri; John O. Boone, Commissioner of the Massachusetts State Department of Corrections; Timothy Leland, Assistant Managing Editor of the Boston Globe; Noah L. Alldredge, Warden, U. S. Penitentiary, Terre Haute; Floyd L. Wainwright, Director, Florida Division of Corrections; Lou V. Brewer, Warden, Iowa State Penitentiary; and Norman A. Carlson, Director of the Federal Bureau of Prisons. Numerous exhibits were received. The parties submitted proposed findings of fact and briefs.

■ No further extended discussion is necessary. It is appropriate, however, to respond to the specific inquiries contained in the Order. The Court has determined on the basis of detailed factual findings filed herewith that private personal interviews are essential to accurate and effective reporting. Ethical newspapers rarely publish articles based on unconfirmed letter communications. Reliability of such information must be determined by face-to-face confrontation. This is universally recognized by experienced journalists and demonstrated by the results of many confidential interviews conducted during the recent Attica investigation. Testimony of Liman and Fisher and the Attica Report itself are particularly persuasive on this key issue. Kleindienst v. Mandel, 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), recognizes the intimate relationship between personal contact and the First Amendment's guarantees.

■ The "big wheel" justification did not withstand analysis. While the term is found in Seale v. Manson, 326 F.Supp. 1375 (D.Conn.1971), it has no precise meaning. Apparently it refers to prisoners whose militancy, tendency to act out and negative influence within a prison community make it likely that sustained press interviews and attention involving them may spark disruptive conduct by inmates within the walls. Not all prominent offenders or prison leaders fall in this category. The very few who do are usually, if not always, identifiable in advance. Interviews with such prisoners can be requested specially. The "big wheel" justification cannot, however, be used to stifle expression by any leader in the prison community who may differ with the warden and certainly it goes too far afield to blanket all federal prisoners under this rhetoric for the obvious purpose of stultifying dissent.

■ The further justification offered that all prisoners must be treated the same because if interviews are permitted in some instances and restricted in others, prison authorities will encounter administrative difficulties, provides no justification for the challenged regulation. This natural desire of federal prison authorities to avoid inconvenience cannot be interposed to defeat insistent demands of the First Amendment. There are, to be sure, situations where press access to individual prisoners should on occasions be denied either because of conditions prevailing at the moment in a particular institution or for other reasons. Some prominent prisoners who exhibit no tendency to unruliness or disruption, for example, may attract such excessive press attention to the point that this interferes with the ability of the institution to adjust the prisoner to appropriate routine. Others

may, after interviews, become identifiable as sources of disruption and some measure of control becomes appropriate.

The evidence strongly shows, however, the inappropriateness of a total interview ban and the necessity and feasibility of pursuing a more flexible approach based on individualized judgments in particular cases. Many city and state penal institutions, apparently the majority, permit interviews. There is nothing significant that distinguishes the bulk of federal prisoners from state prisoners except possibly the need to assure that the federal system as an acknowledged pace setter gives the fullest and most explicit formal recognition to constitutional rights of prisoners.

█ The Bureau of Prisons misconceives its obligation as a public institution. It has no absolute right to exclude the press. On the contrary, it has an obligation to lay open its activities to searching public scrutiny except to the extent that it can affirmatively establish a compelling necessity to limit press access. There is an important and continuing discourse about our prisons, and the "right to receive information" necessary to convey developments to the public is within the scope of protections afforded by the First Amendment. Kleindienst v. Mandel, *supra*, 408 U.S. at 764–765, 92 S.Ct. 2576.

The Court of Appeals has solicited an expression from this Court as to any other consideration that may have a bearing on the issues. Accepting this invitation, it should be apparent that at no time in recent memory has there been such general public concern with prisons and prison conditions. There is much to suggest that prison facilities are often inadequate, funds are lacking or misspent, prisoners with some frequency are abused or mistreated, escapes are frequent, guards are too permissive or sadistic, discipline is lacking, and riots and strikes are everyday occurrences. Society is searching for an understanding of why these institutions appear so often to breed crime and lack satisfactory vocational and effective rehabilitative programs. In several states whole prison systems or major units have been found so lacking that they have been declared offensive under the Eighth Amendment. Trial judges are frustrated, for the intendment of the law is lost in a maze of bureaucratic inadequacies that frustrate effective sentencing. Many prison officials share these concerns. In short, this is a time of questioning and reappraisal when the expense, the futility and the inadequacies of present procedures for incarceration have again come into sharp focus.

No one can responsibly contend that prisoners do not have a point of view and experience that should in some degree affect the resolution of many problems highlighted by the current debate. Certainly no one can successfully contend that in these circumstances the press does not have a vital role to play.

█ The rule adopted by the Bureau of Prisons is a rule of comfortable convenience and not of compelling necessity. It simply serves to prevent too sharp an inquiry into official conduct. Prisons are not walled off sanctuaries like the Pentagon Map Room or the Justices' conference table at the Supreme Court. Prisons are villages in themselves. Families, lawyers, congressmen, clergymen and friends visit in public interview space provided. Newspapers, magazines, radio and television programs pour in incessantly throughout the day. Within the prison walls there is illness, drug distribution, prostitution and many other matters of everyday occurrence on the outside. Crimes are committed and punishments imposed during incarceration. Inmates are of varying ages, political persuasions and background. Some prisoners come and go on furlough or compassionate leave. Mail is substantially uncensored. Local communities are urged to participate in the affairs of these institutions by rendering neighborly family counselling and support. Indeed, half-way houses, vocational and educational programs, and other commu-

nity ventures include prisoners serving time. The press has an obvious role to report the successes and failures of these prison communities and there is no apparent reason why this should differ substantially from the role it normally plays on the outside. The need for public understanding and legislative support of penal institutions is obvious. This will not be forthcoming without knowledge based on informed discussions. The official pronouncements of the keepers need to be tested against the realities of incarceration. It is wholly inconsistent with an open democratic society to allow the state to seal off from press scrutiny thousands of men and women who have been charged with or found to have committed criminal offenses. Certainly the courts that commit these offenders have a responsibility under the Constitution to preserve those rights and freedoms which violation of the criminal laws has never been held to remove.

Nothing in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), suggests a conclusion different from that reached by the Court on the issues here presented. The Court there emphasized that news gathering qualifies under the First Amendment and newsmen must be afforded some protection for seeking out the news lest freedom of the press be eviscerated. *Id.* at 681, 707, 92 S.Ct. 2646. The Court recognized that right of access can only be infringed where the Government demonstrates a "compelling" or "paramount" need. And as Justice Powell, whose vote was necessary to obtain the majority, stressed in his concurring opinion, a balance must be attempted between constitutional and societal interests on a case-by-case basis. *Id.* at 709, 710, 92 S.Ct. 2646. Here newsmen merely seek the same rights to interview at prisons which are afforded relatives, clergymen, congressmen, friends and attorneys, as traditionally available to the public. This is not a case involving any invasion of privacy, interference with national security nor conduct that might in some fashion contravene court processes or other constitutional needs. It is not a mere "reasonable time, place and manner" regulation. The sources of news are solely in the prisons. No alternative satisfactory sources are available and the press claims its proper right of access. While this access may be limited in individual circumstances, the Government has totally failed to demonstrate any "compelling" or "paramount" need. The absolute ban cannot withstand attack.

Other recent decisions are to the same effect. In Police Department of the City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), the Court struck down a city ordinance which permitted peaceful labor picketing but prohibited other peaceful picketing. In holding this ordinance offensive under the First Amendment, the Court noted that "predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications." *Id.* at 100–101, 92 S.Ct. at 2293. This is particularly pertinent, as the decision suggests, in view of the classification here that singles out newsmen to prevent them from exercising interview rights freely given others who present no lesser threat. Similarly, in Women Strike for Peace v. Morton, D.C. Cir., 472 F.2d 1273 (1972), the United States Court of Appeals for the District of Columbia Circuit gave further emphasis to the well-established proposition that any regulations affecting First Amendment conduct must be "precisely worded and specifically directed toward identifiable abuses." *Id.*, Wright, J., conc., at 1285.

In this Court's prior opinion numerous other decisions were cited which are all to the same effect. Each regulation challenged under the First Amendment must be viewed in the light of its own special circumstances and there is no automatic litmus test which can be applied in determining the scope and effect of the Amendment. Where

broad, all-inclusive restrictions are placed in effect, it is particularly important for the state to justify the restrictions with solid fact, not surmise. In this instance the Bureau of Prisons has totally failed to meet this burden and the regulation must be condemned. The Bureau's regulation represents a continuing denial of First Amendment rights.

■ The stay entered by the Supreme Court of the United States, 406 U.S. 912, 92 S.Ct. 1761, 32 L.Ed.2d 112 (1972), has resulted in a continuing serious suppression of paramount constitutional rights which requires immediate attention. A free press cannot be fostered in an atmosphere that delays publication on matters of current public concern. The Courts have a responsibility to lift pre-publication restraints, not to encourage them, and must adjust their deliberative process accordingly.

Because the first two sentences of paragraph 4(b)(6) of the Bureau of Prisons Policy Statement 1220.1A dated February 11, 1972, prohibiting all interviews by members of the press with inmates in the custody of the Bureau, are in violation of the First Amendment to the Constitution of the United States, and because defendants' denials of permission to plaintiffs to interview identified inmates at the federal correctional institutions in Danbury, Connecticut, and Lewisburg, Pennsylvania, made in reliance on Policy Statement 1220.1A, were in violation of the First Amendment, a new regulation is clearly necessary.

■ Under the First Amendment, subject only to reasonable restrictions as to time and place, the press has a right of access to interview confidentially and without censorship any inmate of a federal correctional institution who consents to be interviewed, except where it is determined that serious administrative or disciplinary problems are likely to be directly and immediately caused by the particular interview sought. If such rules authorize any exception to the general policy, the exception must be precisely drawn to prohibit an interview only where it can be established as a matter of probability on the basis of actual experience that serious administrative or disciplinary problems are, in the judgment of the prison administrators directly concerned, likely to be directly and immediately caused by the interview because of either the demonstrated behavior of the inmate concerned or special conditions existing at the inmate's institution at the particular time the interview is requested.

In addition to findings of fact and conclusions of law contained in the Court's two Memoranda, the Court makes the following findings of fact by reference to proposed findings filed by the parties:

The Court adopts each of plaintiffs' proposed findings, except Nos. 29 through 46, and No. 51;

The Court adopts each of plaintiffs' proposed conclusions of law.

Defendants' proposed findings of fact and conclusions of law are rejected.