**George McMILLAN, Plaintiff,**

**v.**

**Norman CARLSON, Director, Federal Bureau of Prisons, Defendant.**

**Civ. A. No. 72–2551–M.**

United States District Court,
D. Massachusetts.

Dec. 31, 1973.

Herman Schwartz, Amherst, N. Y., John Reinstein, Mass. Civil Liberties Union, Boston, Mass., for plaintiff.

James N. Gabriel, U. S. Atty., Edward J. Lee, Asst. U. S. Atty., for defendant.

## MEMORANDUM

FRANK J. MURRAY, District Judge.

The plaintiff, George McMillan, a professional writer-researcher, brings this action against the Director of the Federal Bureau of Prisons, seeking declaratory and injunctive relief from alleged violations of his First and Fifth Amendment rights under the United States Constitution. Jurisdiction of the court is alleged under 28 U.S.C. § 1331 (federal question), § 1361 (action in the nature of mandamus), and §§ 2201, 2202 (declaratory and further relief).

The allegations of the complaint are in brief that plaintiff has a contract with a publisher to write the biography of James Earl Ray and has received substantial advances on anticipated royalties from expected sales of the book; that plaintiff has requested permission from the Warden of the United States Penitentiary at Leavenworth, Kansas, to interview John Larry Ray, an inmate at the Penitentiary, who is the brother of James Earl Ray, for the purpose of writing the biography, and that, although John Larry Ray consented to the interview, the request was refused because of the Bureau's long-standing prohibition against personal interviews.

After plaintiff moved for a preliminary injunction to enjoin defendant from denying plaintiff's request for a face-to-face interview with John Larry Ray, plaintiff filed his motion for summary judgment under Rule 56. Defendant opposed the motion and filed a motion to dismiss under Rule 12(b) and, in the alternative, a motion for summary judgment under Rule 56. In support of their respective motions the parties filed memoranda of law and affidavits. Thereafter a stipulation was entered into and filed giving defendant time to file additional documents. After the court called for a conference of the parties to settle the record, the parties stipulated to the material facts in the dispute arising upon the complaint, and filed with the court on November 19, 1973 a statement of undisputed facts. It is this statement that settles the facts before the court.

I

It is not disputed that plaintiff is a writer engaged in writing the biography of James Earl Ray, and that by letters dated January 28, 1972, April 8, 1972 and May 15, 1972 plaintiff requested the Bureau to grant permission for a face-to-face interview at Leavenworth Penitentiary with the inmate John Larry Ray, brother of James Earl Ray the convicted killer of Martin Luther King. After John Larry Ray at his own request was transferred to the Marion Penitentiary, plaintiff requested permission to interview him there, and that request was denied August 21, 1973. Although John Larry Ray has consented to the interview, the defendant, as Director of the Bureau of Prisons, has denied the several requests.

The Bureau's over-all policy of visitations is set forth in Policy Statement No. 7300.4A, April 24, 1972,[1] whereunder each institution is responsible for development of its own procedures and regulations, within guidelines established by the Bureau. Under the Bureau's policy, visiting privileges are extended only to (a) members of the immediate family, (b) other relatives, (c) close friends, and (d) authorized visits from such persons as clergymen, former or prospective employers, sponsors and parole advisers. In a recent policy statement (Policy Statement No. 1220.-1A, February 11, 1972) entitled "Inmate Correspondence with Representatives of the Press and News Media" the Bureau prohibited interviews with inmates by news reporters.[2] The Bureau has deter-

---

1. *See* Appendix A.

2. "(6) Press representatives will *not* be permitted to *interview* individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, conversation may be permitted with inmates, whose identity is not to be made public, if it is limited to the discussion of institutional facilities, programs and activities."

mined that although authors are not specifically referred to in the policy statement applicable to representatives of the press and news media, authors should likewise be prohibited from face-to-face interviews with inmates at maximum security institutions such as Leavenworth and Marion. There have been difficulties caused by visitors at such institutions, including difficulties of smuggling of contraband, and misrepresentations by persons seeking visitor's privileges apparently to plan or further illegal activities.

The defendant's denials of plaintiff's requests for personal interviews rest solely on the policy of the Bureau to prohibit interviews by authors and on the visiting regulations applicable to Leavenworth and Marion. Such denials do not depend at all on any facts relating to the inmate Ray or to his institutional record. The Bureau is willing, and has so advised the plaintiff, that plaintiff may correspond by mail with Ray and thereby interrogate him on matters relative to the biography and submit chapters of the book for Ray's comments.

## II

It is contended by the plaintiff that as an author contributing to the flow of information to the public he is engaged in the news-gathering function, and is thereby entitled to the First Amendment rights and protections which extend to a newsgatherer. Plaintiff also argues that communication with the inmate by correspondence is not an appropriate alternative to a personal interview as a means of gathering information, because of the inmate's inadequate education which prevents him from expressing his ideas in writing. His argument proceeds that since his right to gather information for the biography [3] is protected by the First Amendment, the Bureau's policy and determination which prohibits the face-to-face interview with John Larry Ray is an unconstitutional intrusion on that right. In considering these contentions it should be observed that the case does not involve the claim of a news reporter of his right to seek out information from the inmate himself as to prison or disciplinary conditions or other institutional controls or activities affecting prisoners within the institution where the inmate is confined.[4]

The sole issue is whether plaintiff has a First Amendment right to the particular mode of access to Ray requested which is violated by the Bureau of Prison's policy prohibiting the interview. It is not disputed that the Bureau has not denied plaintiff all access to Ray as a source of information for the biography, for plaintiff has been assured of the right to interrogate Ray by correspondence and to elicit Ray's comments on plaintiff's work drafts. In view of these permitted procedures can it be said that the Bureau's policy prohibiting a personal interview intrudes unconstitutionally upon protected First Amendment rights?

## III

■ The right to publish is firmly embedded in the First Amendment and is central to the constitutional guarantee of free speech and a free press. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). The guarantee is "not for

---

3. *See* Branzburg v. Hayes, 408 U.S. 665, 705, 92 S.Ct. 2646, 2668, 33 L.Ed.2d 626 (1972) where the Court said: "The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public. . . . "

4. *Compare:* Seattle-Tacoma Newspaper v. Parker, 480 F.2d 1062 (9th Cir. 1973); Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); Houston Chronicle Publishing Co. v. Kleindienst, 364 F.Supp. 719 (S.D.Texas 1973); Mitford v. Pickett, 363 F.Supp. 975 (E.D.Ill.1973); The Washington Post Co. v. Kleindienst, 357 F.Supp. 779 (D.D.C.1972); Seale v. Manson, 326 F.Supp. 1375 (D. Conn.1971).

the benefit of the press so much as for the benefit of all of us". Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967).

■ While newsgathering is viewed as being within the ambit of First Amendment protection as a corollary of the right to publish, for "without some protection for seeking out the news, freedom of the press could be eviscerated", Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972), the extent of access to news sources remains undefined. In another context the Supreme Court has said "[t]he right to speak and publish does not carry with it the unrestrained right to gather information", Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965), and this should, of course, be read together with principles firmly enunciated by the Court as to the broad sweep of the First Amendment protections. For example: "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas. . . . It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences . . . ." Red Lion Broadcasting Co., Inc. v. F. C. C., 395 U.S. 367, 390, 89 S.Ct. 1794, 1806 and 1807, 23 L.Ed.2d 371 (1969). The public's right to "receive information and ideas" has been recognized and referred to by the Court in a variety of situations. See, e. g., Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). Recently, other courts have recognized that a prisoner's claimed right of communication with the press "is enhanced by the right of the public to hear". Nolan v. Fitzpatrick,

451 F.2d 545, 548 (1st Cir. 1971). The principle is firmly established in rules of constitutional adjudication that when First Amendment protections exist in the area of freedom of speech stringent standards are to be applied to governmental intrusions, upon its exercise, and claimed justifications for denying or burdening free speech are to be subjected to careful and rigid scrutiny.[5] Moreover, whenever governmental action may justifiably impinge upon freedom of speech in pursuit of legitimate governmental goals, it is clear that the goals sought may not be achieved by means having an unnecessarily broad impact on the rights of speech.[6]

■ Where the avowed purpose of the plaintiff-author-newsgatherer in writing and publishing the biography of James Earl Ray is directly related to information, ideas and experiences of the assassin of Martin Luther King, as light may be shed on them from the interview with a member of the assassin's family who is willing to talk, justification for the Bureau's policy that bans the interview rests upon the Bureau, cf. Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Thus, the defendant has the burden to establish whether the Bureau's ban "furthers an important or substantial governmental interest; [that] the governmental interest is unrelated to the suppression of free expression; and [that] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest". United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

## IV

■ Defendant's claim is that justification for the policy ban is rooted in the statutory duties imposed on the Bureau

---

5. Police Dept. v. Mosley, 408 U.S. 92, 92 S. Ct. 2286, 33 L.Ed.2d 212 (1972); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

6. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); United

States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); Nolan v. Fitzpatrick, note 4 supra.

of Prisons by 18 U.S.C. §§ 4041, 4042, whereby it is vested with the "management and regulation" of federal prisons, and is required to "provide for the protection, instruction, and discipline of all persons charged with or convicted" of federal crimes. From this it is argued that permitting interviews with inmates by authors would be a threat to prison discipline and prison security, would tax administrative procedures, and tend to undermine the Bureau's policy of control over publication of inmates' manuscripts.[7] Prison discipline and prison security are important and substantial governmental interests, and wide latitude should be allowed to prison officials in the making of regulations to preserve them. But where the ban on personal interviews by authors is total, yet interviews by other persons are permitted, the regulation on its face appears arbitrary.

Further and deeper analysis of the Bureau's position prohibiting the interviews reveals support for it in the Bureau's apprehension of possible specific disciplinary and security problems and additional administrative burdens.[8] These good faith apprehensions and impressions of the defendant, founded upon individual experience and the experience and judgments of other prison officials, must be viewed in the context of the wide latitude accorded them to manage and control the institution; and the court should not substitute its judgment in matters of discipline and security for that of the prison administrators. But it has not been shown that the only means of preventing the apprehended problems is the total ban on all interviews. In the case of the plaintiff, no question has been raised by defendant that granting him permission for the interview will or is likely to entail specific security problems. Nor has it been shown that as a result of the interview there is the likelihood of security or disciplinary problems arising from John Larry Ray's participation. Administrative inconvenience or problems, if any, arising from the making of arrangements for an interview between plaintiff and Ray ought not to be different in kind than those encountered in processing other visitors, and, perhaps, far less burdensome where much more opportunity and more time would be afforded the Bureau to know of plaintiff here and to arrange the time and place of an interview.

When First Amendment rights of speech are at stake, it is not reasonable to rule that all authors, or even that all inmates, should be treated alike in denying personal interviews especially when distinctions can rationally be drawn to differentiate among inmates on the basis of their over-all records and among authors on their credentials. Denial of an interview based on a fair evaluation of the performance or behavior records of the particular author or inmate which demonstrated a serious threat to prison interests would avoid at the very least the complaint of arbitrary action. Such denial of permission for the interview could be found to accommodate both legitimate governmental interests and First Amendment protections. But no showing has been made here by the defendant that a visiting regulation applicable to authors which would provide for the discretionary granting or withholding of permis-

---

7. Control over publication of an inmate's manuscript does not appear as a threatened legitimate "governmental" interest in the case here. In the undisputed facts plaintiff's role as a biographer of James Earl Ray is undoubted. Moreover, it is undeniable that plaintiff is neither seeking to "ghost write", nor aid the inmate in writing, the life of John Larry Ray, or other manuscripts of Ray. Further, the tendered permission to interrogate Ray by correspon-dence and to solicit his views on plaintiff's work product on the biography would seem no less a threat to the Bureau's policy. Finally, the proscribed ban on publication of the inmate's manuscripts would appear to intrude upon the prisoner's First Amendment rights to communicate with the public. See Nolan v. Fitzpatrick, note 4 supra.

8. See Appendix B, Affidavit of Norman A. Carlson, Director, Federal Bureau of Prisons, April 4, 1973.

sion for personal interviews based on a case-by-case evaluation would not be feasible. In The Washington Post Co. et al. v. Kleindienst et al., 357 F.Supp. 779 (D.D.C.1972), the court said:

> Under the First Amendment, subject only to reasonable restrictions as to time and place, the press has a right of access to interview confidentially and without censorship any inmate of a federal correctional institution who consents to be interviewed, except where it is determined that serious administrative or disciplinary problems are likely to be directly and immediately caused by the particular interview sought. If such rules authorize any exception to the general policy, the exception must be precisely drawn to prohibit an interview only where it can be established as a matter of probability on the basis of actual experience that serious administrative or disciplinary problems are, in the judgment of the prison administrators directly concerned, likely to be directly and immediately caused by the interview because of either the demonstrated behavior of the inmate concerned or special conditions existing at the inmate's institution at the particular time the interview is requested.

*Id.,* at 784.

This clear and persuasive statement of Judge Gesell of the rights of the press to personal interviews with inmates in federal institutions is apposite to the case here. The court is not persuaded that the decisions denying press interviews in the cases of Seattle-Tacoma Newspaper v. Parker, No. 9557 (W.D. Wash., May 5, 1972), affirmed 480 F.2d 1062 (9th Cir. 1973); Smith v. Bounds, No. 2914 (E.D.N.C.1972), affirmed No. 73–1658 (4th Cir., June 8, 1973); Mitford v. Pickett, 363 F.Supp. 975 (E.D. Ill.1973); Seale v. Manson, 326 F.Supp. 1375 (D.Conn.1971); should be followed in the instance of an author.

 The Bureau's total ban policy of personal interviews of an inmate by an author is an invalid restriction of First Amendment rights of freedom of speech. This conclusion is reached not by substituting the judgment of the court for that of prison officials, but after weighing and balancing the Bureau's justifications against the public's right to receive information and ideas, and in the light of the Bureau's policy allowing certain interviews. The justifications offered leave the court unconvinced that the policy's impact on protected First Amendment freedoms is essential to the furtherance of legitimate prison interests. Whether the Bureau's limited permission of communication by correspondence with the inmate removes the condemned restriction, turns upon the question whether the permitted means of communication provides suitable access to the inmate's sources of information.

There is substantial disparity in essential values between face-to-face discussion and dialogue, on the one hand, and communication by correspondence, on the other, between strangers willing to engage in a dialogue, especially where one of the parties is an incarcerated prisoner. Such disparity can impermissibly impinge on full and fair newsgathering if it constitutes a barrier to effective communication, or inhibits research, to the point where the public's right to "receive information and ideas" is unnecessarily impaired. Inability on the part of the inmate to adequately communicate what he knows by correspondence will constitute such a barrier as will any reluctance of the inmate to communicate raised by fears that his information may be disclosed to prison officials. A face-to-face interview conceivably could surmount such barriers. Lack of opportunity on the part of the author to study the demeanor and behavior of the inmate in face-to-face dialogue might naturally impair or even undermine the author's confidence in the reliability of the inmate's information. Defendant has the burden of proving the suitability of the alternate means offered to plaintiff. In determining that no satisfactory showing has been made

that the Bureau's limited offer does in fact remove the impermissible restriction on freedom of speech, the court has not overlooked the purpose of the interview which is to elicit from Ray information of the ideas and experiences of a third person, his brother, as they may indeed contribute to the public's understanding and evaluation of a widely publicized tragic political event of the 60's.

In accordance with this memorandum a judgment and order may enter as follows:

(1) That the denial by the defendant Norman Carlson, as he is Director of the Federal Bureau of Prisons, of permission to plaintiff George McMillan to interview personally John Larry Ray, an inmate of the Federal Penitentiary at Marion, Illinois, is in violation of the First Amendment to the United States Constitution.

(2) That the defendant shall grant within thirty (30) days of this order permission to the plaintiff to interview personally John Larry Ray, confidentially and without exercising any censorship, subject only to reasonable provisions of time and place of the interview.

## APPENDIX A

BUREAU OF PRISONS WASHINGTON, D. C. 20537

POLICY STATEMENT

| 7300.4A |

SUBJECT: VISITING REGULATIONS

| 4-24-72 |

1. POLICY. In order to achieve the main objective of the Bureau of Prisons—correction of the offender—it is essential that the individual offender develop and maintain healthy family and community relationships. Due to the difficulty in fostering positive relationships in a penal or correctional setting, visits by family and community groups are to be stressed as an important factor in maintaining the morale of the individual offender and motivating him toward positive aspirations. Visits are to be utilized as opportunities for developing closer relationships between the staff, family members, and community groups for the purpose of more effective program planning. Visits should be conducted and supervised in a manner which will contribute to good public relations, to a better understanding of the institution's program, and to a better understanding of the overall mission of the Bureau.

2. PURPOSE.
 a. To provide updated information pertaining to visiting regulations.
 b. To standardize the format for Policy Statement issuances.

3. DIRECTIVES AFFECTED. Policy Statement 7300.4 (Manual Bulletin No. 276), Visiting Regulations, dated 7-1-49, is rescinded.

4. VISITING REGULATIONS. Because of the practical considerations and because of the nature of correctional institutions, certain limitations must be recognized and controls established in developing and administering visiting regulations. The size, mission, loca-

tions, and other variables will indicate the limitations which must be recognized and the controls necessary in each facility. Each institution shall develop the procedures and regulations required to administer the Bureau's visiting policy. The practical considerations which demand controls upon visits include the limitations of visiting space, the time and administrative expense incident to arranging and supervising visits, and the need for maintaining other institutional activities without unnecessary or extended interference. The extent of these limitations will vary with each institution, and they should be recognized as the only reasons upon which restrictions on visiting should be based.

5. GUIDELINES.

 a. *Visiting Facilities*

 The visiting room should be arranged to provide adequate supervision, adapted to the degree of security required by the type of population. It should be as comfortable and pleasant as possible, and informally arranged. Appropriate furnishings (e. g., small tables and chairs, settees, and other less formal furniture arrangements), are perferable to the "conventional" prison visiting table. This is particularly true in institutions for juveniles, reformatories, correctional institutions, and camps, but may apply to penitentiaries, except where offenders who are in maximum security or who are supervision risks are involved. The camps, reformatories, juvenile and correctional institution visits may be held beyond the security perimeter when the weather permits, but always under supervision of an officer. Penitentiaries may establish outdoor visiting when weather and facilities permit, but always inside the security perimeter. If space is available, a portion of the visiting room should be equipped and set up to provide a diversion for the children of visitors.

 b. *The Visiting Room Officer*

 Visits must be supervised to prevent the passage of contraband and to insure the security and welfare of the institution. Visits have an inevitable and extensive public relations aspect. The impressions gained by the visitor, whether he be a member of the offender's family or a government official, are of the utmost importance. For these reasons, selections for this correctional assignment should not be left to chance or shifted frequently. The officer's personal appearance, his manner of speech, his ability to be tactfully firm, his alertness, his grasp of regulations, and his judgment in sensing situations requiring referral to other institutional departments, will determine the effectiveness of the visit.

 c. *Visiting Times*

 Each institution will establish its own visiting schedules. Although visiting on Saturdays, Sundays, and holidays may be emphasized, the restriction of visiting to these days may be a hardship upon some families and arrangements for suitable

hours should be made if at all possible. Evening visiting hours can and should be established where staff resources permit.

d. *Frequency of Visits*

Limitations on the length or frequency of visits should be imposed only to avoid chronic overcrowding. A reasonable number of visits or number of hours per month shall be established consistent with resources available. Exceptions should be made to any such rules where indicated by special circumstances, such as distance the visitor must travel, frequency of the inmate's visits, or health problems of the offender.

e. *Regular Visitors*

The casework staff will be responsible for compiling a regular visiting list for each offender and the following should be placed on the approved list after suitable investigation:

(1) *Members of the Immediate Family*

This includes mother, father, step-parents, foster parents, brothers and sisters, wife or husband and children. Under ordinary circumstances, there would be no question about placing such persons on the regular visiting list of the offender.

(2) *Other Relatives*

These include grandparents, aunts, uncles, in-laws, and cousins, who may be placed on the approved list if the inmate wishes to have such visits regularly.

(3) *Friends and Associates*

The visiting privilege may be extended to friends and other nonrelatives if it can be ascertained that the association or friendship is a genuinely constructive one and that the offender would profit from such continued contact.

(4) *Persons with Criminal Records*

The existence of a criminal record of itself should not constitute a barrier to proposed visits. Consideration should be given to the nature and extent of the criminal record and history of recent criminal activity as weighed against the value of the relationship. Each such case, however, should have the specific approval of the Chief Executive Officer or his designated representative.

(5) *Children Under Sixteen*

It is not considered desirable that children under the age of 16 be permitted to visit unless accompanied by a responsible adult. Exceptions in unusual circumstances may be made by special approval of the Chief Executive Officer.

(6) *Number of Visitors*

Some limitations may be necessary where the inmate has a large number of regular, approved visitors living in the vicinity of the institution. Where facilities permit, family groups should be allowed to visit. The Chief Executive Officer may establish a regulation as to the maximum num-

ber of persons who may visit an inmate at one time, but these regulations should be interpreted flexibly, their purpose being simply to prevent overcrowding in the visiting room or unusual difficulty in supervising a visit.

(7) *Special Visits*

Special visits may be authorized by the Chief Executive Officer or his designated representative. These persons include clergymen, former or prospective employers, sponsors, and parole advisers. Visits in this category serve such purposes as assistance in release planning, counseling, and discussion of acute family problems.

(8) *Business Visitors*

It is the policy of the Bureau of Prisons that no inmate shall be permitted to engage actively in a business or profession while serving a sentence. An inmate who has engaged in a business or profession prior to commitment will be expected to delegate authority for the operation of such business or profession to a qualified person. This does not mean that the offender may not have a visit which may be necessary to protect his resources or financial interests. Even though the offender has turned over the operation of his business or profession to another person or persons, there may be an occasion where a decision must be made which will substantially affect the assets or prospects of the business. Insofar as possible, business matters which require the offender's attention should be resolved by special purpose correspondence.

Before visits of this kind are permitted, it should be ascertained that the business is of a legitimate nature. The time allowed for the visit shall be determined by the Chief Executive Officer or his authorized representative. Special arrangements may be necessary in the instances where those listed as special offenders are involved. In these instances, and when there are excessive requests for business visits, the matter should be brought to the attention of the Director, with a full statement of the details.

Whenever it has been determined that an offender is a citizen of a foreign country, the consular representative of that country shall be permitted to visit such offenders on matters of legitimate business. This privilege shall not be withheld even though the inmate may be undergoing punishment status.

(9) *Attorney Visits* (See P.S. 2001.2B—Attorney Visits).

f. *Visits to Offenders Not in Regular Population Status*

(1) *Admission Status*

Visits during the admission—orientation period may generally be limited to the immediate family. Howeve:, some

flexibility and good judgement should be exercised in approving or disapproving visitors during this time period.

(2) *Hospital Patients*

When visitors come to see an offender who is hospitalized, the Chief Medical Officer, in consultation with the Chief Correctional Supervisor will determine whether a visit should take place and if so whether it should be held in the hospital. Visits that are allowed to take place in the hospital will be supervised, and the Chief Correctional Supervisor will provide escort for the visitors. When the Chief Medical Officer recommends against the visit because the offender is suffering from an infectious disease, is in a psychotic or emotional episode which makes a visit inadvisable, or is otherwise not in a condition to see visitors, the situation should be very carefully interpreted to the visitor by the Chief Executive Officer or his authorized representative.

(3) *Disciplinary Status*

Visiting privileges should not be taken away from an inmate because of violation of institution regulations, other than those specifically related or concerned with the visiting regulations. However, inmates in segregation or isolation may be denied a visit, if in the opinion of the Chief Executive Officer or his authorized representative, it would jeopardize the security of the institution.

g. *Visits from Community Groups and Individuals*

Offenders who have no friends or relatives who can visit them deserve special attention. Others who may particularly benefit are those offenders whose relatives or friends do not have a constructive influence on them and offenders who feel they are outcasts and have little prospect for satisfactory community adjustment. Still others are persons who present special problems such as intense feelings on social relationships. Visits from members of the community should assist the inmate in developing and maintaining a more normal social attitude and outlook. It should be viewed as an influence which can assist in breaking down the traditional isolation under which the offender lives.

Sources which should be drawn upon are civic and religious organizations and other persons whose interest and qualifications for this kind of service may be known to various staff members. Generally, visits for inmates already involved in community based programs will be held in the institutional visiting room. However, special visits in the community may be specifically approved, but only in accordance with the Policy Statement on Inmate Furloughs. (See P.S. 7300.12A)

h. *Procedures*

The Chief Executive Officer of the institution is responsible for the establishment and enforcement of visiting regulations and their adaption to the institution in accordance with the

policies issued by the Central Office. He can, at his discretion, delegate to the Chief, Classification and Parole such authority as he deems advisable. The Chief, Classification and Parole shall be responsible for furnishing the Chief Executive Officer and other staff current information concerning all visitors and shall assist the Chief Executive Officer in the general supervision of this phase of institutional administration, however, the Chief Correctional Supervisor is responsible for the appearance of the visiting room and the selection and training of the Visiting Room Officer.

(1) *Preparation of the List of Visitors*

Each offender will submit to the Classification and Parole Office a list of persons with whom he wishes to visit. This action will normally occur during the Admission-Orientation period. After appropriate investigation of the proposed list of visitors, the Parole Office will prepare in duplicate a list of all visitors approved for regular visiting. Distribution will be made to the inmate file, the individual inmate concerned, the Visiting Room Officer, and other officers responsible for identification of persons as approved visitors. This will ordinarily be done within the first few days after the inmate's commitment, hopefully, within 48 hours.

Visitors should receive a courteous notification of their approval as visitors including a copy of the visiting regulations. These regulations should provide specific instructions for reaching the institution and should make reference to Section 1791, Title 18, U.S.Code, which provides a penalty of not more than ten years for any person who introduces or attempts to introduce into or upon the grounds of any Federal penal or correctional institution or takes or attempts to take or send therefrom anything whatsoever without the knowledge and consent of the Chief Executive Officer of the institution. Additions to or deletions from the list of visitors will be approved by the Classification and Parole Department and forwarded routinely.

(2) *Identification of Visitors*

The usual means of identification are automobile driver's licenses, Social Security card, membership cards of various kinds bearing a signature of the visitor or other personal papers. These need not be the sole basis of identification. Tactful questioning on the basis of available information may help clear up doubtful cases. Inability to establish identity should be reported to the Chief Executive Officer or his authorized representative.

(3) * *Records of Visitors*

Institutions will maintain a record of visitors to inmates in connection with the inmates visiting record rather than

a register at the entrance to the institution. This may or may not involve the visitor's signature.*

(4) *Supervision of Visits*
In the supervision of visiting, it is the responsibility of the Visiting Room Officer to make certain that all visits are conducted in a quiet, orderly, and dignified manner.

The staff should be aware of any articles passed between the offender or his visitor. If there is a substantial basis to conclude that materials are being passed which constitute contraband or are otherwise in violation of the law or regulations, the Visiting Room Officer may examine the paper. The Chief, Classification and Parole or the duty officer should be consulted in questionable cases.

In no instance shall the Visiting Room Officer accept articles or gifts of any kind for an offender, except packages which have had prior approval by the Chief Executive Officer or his designated representative. Money may be left for deposit in the inmate's commissary account, and each institution shall devise its own method of handling money in compliance with the Commissary Manual.

Handshaking, embracing, and kissing by immediate members of the family may be permitted within the bounds of good taste at the beginning and end of the visit. The reason for limiting physical contact is to minimize the opportunity to introduce contraband into the institutions.

(5) *Penalty for Circumventing Regulations*
Any effort to circumvent or evade the visiting regulations established by any Bureau of Prisons facility will not only result in the denial of future visits, possibly over an extended period of time, but may require that other disciplinary action and possible court proceedings be initiated against the visitor.

s/ Norman A. Carlson
NORMAN A. CARLSON
Director, Bureau of Prisons
Commissioner, Federal Prison Industries, Inc.

## APPENDIX B

### AFFIDAVIT

District
 of } ss:
Columbia

I, Norman A. Carlson, being duly sworn, do hereby state that I am Director of the Bureau of Prisons, United States Department of Justice. In that capacity, I am responsible for the establishment, implementation and interpretation of those policies which regulate the operations of this Bureau.

The Bureau's overall policy of visiting with inmates in federal institutions is set forth in Policy Statement No. 7300.4A entitled "Visiting Regulations" dated April 24, 1972, (attached hereto as Appendix A).[*] Under this policy statement each institution is responsible for the development of its own procedures and regulations required to administer the Bureau's visiting policy, within the guidelines established by the Bureau.

Under the Bureau's visiting policy, visiting privileges are extended only to those within the following categories: 1) members of the immediate family; 2) other relatives; 3) close friends; and 4) authorized visits from such persons as clergymen, former or prospective employers, sponsors, and parole advisers.

The Bureau does not permit interviews with inmates by authors. In a recent Policy Statement entitled "Inmate Correspondence with Representatives of the Press and News Media" the Bureau prohibited interviews with inmates by news reporters (Policy Statement No. 1220–1A, dated February 11, 1972, attached hereto as Appendix B).[**] Although authors are not specifically referred to in the Bureau's regulations applicable to representatives of the press and news media, it was decided that authors should likewise be prohibited from conducting personal interviews.

In reaching its policy with respect to authors, the Bureau was concerned with the threat to prison discipline. To grant interviews, particularly with some of the inmates who have been involved in serious incidents, would create and magnify disruptive conditions in the institutions. It would develop leadership ranks in the inmate population and exaggerate the importance of those inmates having a negative, hostile and destructive attitude toward prison life, who would encourage other individuals to have the same hostile approach. This is especially true since our experience indicates that reporters and presumably authors as well, are frequently interested in the inmate who has been a management problem to the institution. The encouragement of this type of leadership poses a serious threat to the security and control of the institution, especially in a maximum security institution such as Leavenworth Penitentiary.

The Bureau was further concerned with the threat to prison security posed by visits with inmates by all those representing themselves as

---

* Designated as Appendix A to this Memorandum.
** Deleted from but referenced in this Memorandum, see fn. 2.

authors. In some respects, open visits with inmates by authors would create an even greater security problem to the institution than with regard to news reporters. Authors, unlike members of the press, carry no credentials or indicia of their status as authors. Anyone can claim to be gathering material for publication of a book. Furthermore, institutions do not have the resources to properly screen every visitor who purports to be an author and to make an accurate assessment of the purpose of each visit. Any policy which would "open the doors" to all those purporting to be authors would undermine the operation of screening procedures and threaten the security of a maximum security institution such as Leavenworth Penitentiary, as well as all other federal prisons, by enabling the easier introduction of contraband.

It is not at all uncommon to have visitors to our institutions attempt to smuggle in contraband, especially narcotics, to inmates. This has happened not only at Leavenworth, but it is also a concern at virtually all our institutions. Other types of contraband have also been introduced. For example, guns were smuggled into the Atlanta Penitentiary by a visitor, and given to an inmate in the institution hospital, who then used the weapon to take hostages. Obviously, the inability to screen visitors will exacerbate this problem.

Another significant factor taken into account in reaching the Bureau's policy with respect to authors was the problem of controlling inmate manuscripts for publication. Under Bureau Policy No. 7300.7A entitled "Inmate Manuscripts" dated July 7, 1971, manuscripts which relate to the life or criminal career of the inmate, or any other person, pertain to matters in litigation, or adversely affect security or discipline, may be disapproved. In the Bureau's view, permitting the plaintiff in this action, George McMillan, to interview the inmate John Larry Ray to obtain material relating to the life of the inmate or his brother for later publication would circumvent the restrictions of the manuscript policy statement.

In conclusion, open visiting by all those representing themselves as authors would seriously erode the Bureau's visiting policy which extends visiting privileges to limited categories of persons closely associated with the inmates. In the Bureau's judgment an open visiting policy would violate the Bureau's statutory responsibility to provide for the safekeeping, protection and discipline of all inmates in federal institutions.

s/ Norman A. Carlson

NORMAN A. CARLSON, Director
Bureau of Prisons

Subscribed and sworn to before me this 4th day of April 1973.

s/ Sharon Schult

NOTARY PUBLIC
My Commission Expires May 31, 1977