**The GLOBE NEWSPAPER COMPANY and Richard J. Connolly, Plaintiffs,**

v.

**Robert H. BORK and Norman A. Carlson, Defendants.**

**Civ. A. No. 73–3748–G.**

United States District Court, D. Massachusetts.

Feb. 12, 1974.

Thomas F. Walsh, Bingham, Dana & Gould, Boston, Mass., for plaintiffs.

William A. Brown, Asst. U. S. Atty., Boston, Mass., for defendants.

### MEMORANDUM AND ORDER GRANTING PRELIMINARY INJUNCTION

GARRITY, District Judge.

Plaintiffs Globe Newspaper Company and its reporter Richard Connolly, after a refusal by federal prison officials to allow a face-to-face interview with an inmate named Clifford Irving at the Federal Correctional Institution at Danbury, Connecticut, filed this suit seeking access to inmate Irving by way of injunctive relief against Acting Attorney General Robert H. Bork [1] and Director of

---

1. In the interim, William B. Saxbe has been appointed Attorney General and it is ordered that he replace Mr. Bork as a party defendant. Also, inmate Irving has been transferred from Danbury to a half-way house in New York City; but defendants have forbidden interviews with him there on the basis of the same policy statement previously relied upon.

the United States Bureau of Prisons Norman A. Carlson. The Globe, a major daily newspaper with the largest circulation in New England, has an avowed desire to obtain and publish news of public interest, including news related to penal institutions and prisoners. Richard Connolly is employed by the Globe, has editorial and reporting responsibilities and enjoys a substantial independent reputation as a responsible member of the press. Clifford Irving is an author who sprang to notoriety when he fraudulently sold to a national magazine a purported biography of Howard Hughes which he misrepresented as having been composed with Mr. Hughes' authority and assistance.

At issue is the constitutionality of a Bureau of Prisons policy which prohibits completely interviews by press representatives with individual inmates, pursuant to which the interview requested by Connolly was denied by the defendants. Bureau of Prisons Policy Statement 1220.1A, paragraph 4b(6), which contains that policy, states:

> Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, conversation may be permitted with inmates whose *identity is not made public, if it is* limited to the discussion of institutional facilities, programs and activities.

Statement 1220.1A is but part of a regulatory scheme dealing generally with prison visits and with media access to federal institutions. In particular, that scheme allows visits by family members, lawyers, congressmen and clergy and no restrictions are placed on the content of the conversations. Visits are also allowed by social workers and community groups. Bureau of Prisons Policy Statement 7300.4A. The media cannot interview specified individual prisoners. Prisoners may correspond with the media through the mails, and media representatives may write to inmates. Bureau of Prisons Policy Statement 1220.-1A, ¶ 4b(2). Media representatives may also visit federal institutions, and during such a visit may engage in short conversations with prisoners they see by chance during the course of such visits. Id. at ¶ 4b(5). Conversations may be permitted with inmates whose identity is not to be made public if the dialogue is limited to institutional facilities, programs and activities. Id. at ¶ 4b(6).

██ Plaintiffs contend that the denial of access to inmate Irving and the underlying Bureau of Prisons policy are unconstitutional under the First Amendment and the Due Process Clause of the Fifth Amendment. Plaintiffs moved for a preliminary injunction and defendants countered with a motion to dismiss or for summary judgment. After hearing and upon consideration of the briefs, affidavits and stipulations, the court finds that plaintiffs have demonstrated a substantial probability of ultimately prevailing on the merits and that immediate and irreparable harm will result unless injunctive relief is granted. The defendants' motion is correspondingly denied.[2]

---

**2.** While conceding jurisdiction and plaintiffs' standing to raise personal claims of infringement of freedom of the press, defendants question their standing to raise the rights of prisoners and of the public. Since our decision rests upon plaintiffs' own First Amendment rights, it is unnecessary to decide that question. If need be, however, we would rule that plaintiffs do have standing to raise the rights of prisoners and of the public in the denial of face-to-face interviews. The ability of litigants to raise First Amendment rights beyond their own was first recognized in Thornhill v. Alabama, 1940, 310 U.S. 88, 96–98, 60 S.Ct. 736, 84 L.Ed. 1093. See H. Hart & H. Wechsler, The Federal Courts and the Federal System (2d ed. 1973) 206. Once judicial review has been properly invoked by a party, standing to raise the rights of the public, Sierra Club v. Morton, 1972, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed. 2d 636, and of other individuals, Eisenstadt v. Baird, 1972, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349, continues to be recognized. See also, Griswold v. Connecticut, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510.

Contrary to defendants' initial contention, plaintiffs' assertions of First Amendment rights cannot be summarily disposed of by reference to Branzburg v. Hayes, 1972, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626. In that case the plaintiff newsmen were claiming a conditional privilege of immunity from being subpoenaed to testify before a grand jury until it had been demonstrated that a crime had been committed and that the information sought was unavailable from other sources. Their argument was that any such compelled testimony would dry up reporters' sources and therefore inhibit "the free flow of information protected by the First Amendment." *Branzburg, supra,* at 680, 92 S. Ct. at 2656. However, in denying the asserted privilege, the Court explicitly noted,

> We do not question the significance of free speech, press, or assembly to the country's welfare. Nor *is it suggested that news gathering does not qualify for First Amendment protection*; without some protection for seeking out the news, freedom of the press could be eviscerated. But these cases involve no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold. . . . *reporters remain free to seek news from any source by means within the law. Id.* at 682–683, 92 S.Ct. at 2656–2657. (emphasis added).

Again, at 707, 92 S.Ct. at 2670, the Court pointed out that "news gathering is not without First Amendment protections," but was not substantially jeopardized by grand jury investigations.[3]

On the other hand, the Court in *Branzburg* did refer, at 684, 92 S.Ct. at 2658, to the absence of a "constitutional right of special access to information not available to the public generally." The Court then went on to list the valid exclusions of the press from grand jury proceedings, judicial conferences, executive sessions and meetings of private organizations. We start from the presumption that the Court did not intend by this language to contradict its own assertions elsewhere in the opinion that news gathering is entitled to First Amendment protections.[4] Since news gathering is constitutionally protected, some access by the press is constitutionally protected. McMillan v. Carlson, 1182 F.Supp. 369 (D.Mass., 1973); Lewis v. Baxley, 368 F.Supp. 768 (D.Ala., 1973). The question is, what is the extent of that protection with respect to inmates in correctional institutions?

Absent state action, newsmen lack the premise to assert an infringement of freedom of the press. But here there can be no claim of an absence of state action. Thus defendants' references to exclusions of the press by private organizations and cases dealing primarily with the question of the presence of state action, such as Lloyd v. Tanner, 1972, 407 U.S. 551, 92 S.Ct. 2219, 33 L. Ed.2d 131, and Amalgamated Food Employees Union v. Logan Valley Plaza, 1968, 391 U.S. 308, 88 S.Ct. 1601, 20 L. Ed.2d 603, are inapposite. See Colum-

---

3. The decision against a privilege in the *Branzburg* case rested upon three conclusions reached by the Court: first, that no factual showing demonstrated a significant impact upon freedom of the press in the absence of the privilege; second, that the public interest in successful grand jury investigations was paramount to the interest asserted by the press; and third, that the privilege contended for would be of little practical value to the press. See 53 B.U.L. Rev. 497, 506 (1973).

4. This presumption, however, is itself unnecessary. The Court's opinion in *Branzburg* was concurred in by only four justices. Justice Powell in a concurring opinion made explicitly clear his view that the Court was not holding that "newsmen . . . are without constitutional rights with respect to the gathering of news." *Id.* at 709, 92 S.Ct. at 2671. Given Justice Powell's position that news gathering is within the First Amendment's protection and the dissent by four Justices, it is apparent that the Court has unanimously adopted the view that news gathering is constitutionally protected.

**1138**

bia Broadcasting System, Inc. v. Democratic National Committee, 1973, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772; Moose Lodge No. 107 v. Irvis, 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627. Nor do we view the defendants' position as supported by past rejections of access claims in Kleindienst v. Mandell, 1972, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683, and Zemel v. Rusk, 1965, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179. Those cases were dominated by the executive interest and judgment in foreign affairs. The judiciary has always afforded the executive a wide berth in its conduct affecting foreign affairs and therefore those cases would be a wholly inappropriate gauge for measuring individual freedoms in a purely domestic affair. Also inapposite are cases dealing with protests by outsiders within jails, such as Adderly v. Florida, 1966, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149. The obvious difference in security risks posed by a protest by outsiders within the prison walls versus a face-to-face interview of a single prisoner by a reputable member of the press makes it apparent that the constitutional validity of a refusal to allow face-to-face interviews of prisoners by the press must be judged solely upon its own merits.

Media access to prisoners for face-to-face interviews has recently been the subject of several court challenges. In Seattle Tacoma Newspaper Guild, Local #82 v. Parker, 9 Cir., 480 F.2d 1062, decided June 7, 1973, the prohibition of face-to-face interviews at the McNeil Island Federal Penitentiary was upheld.[5] In that case, interviews which had previously been allowed were suspended during a prisoner strike when emergency measures were in effect to restore order. McNeil Island is, however, a maximum security prison and the court's decision was explicitly limited to maximum security institutions. Other cases sustaining refusals of access were concerned primarily with particular situa-

tions and not flat prohibitions of access: Mitford v. Pickett, E.D.Ill.1973, 363 F.Supp. 975; Burnham v. Oswald, W.D.N.Y.1971, 333 F.Supp. 1128, and Seale v. Manson, D.Conn.1971, 326 F.Supp. 1375. Absolute bans on face-to-face prison interviews were invalidated in Hillery v. Procunier, N.D.Cal.1973, 364 F.Supp. 196, jur. noted sub nom., Procunier v. Hillery, —— U.S. ——, 94 S.Ct. 862, 38 L.Ed.2d 751 (1974). Houston Chronicle Publishing Company v. Kleindienst, S.D.Tex.1973, 364 F.Supp. 719, and Washington Post Co. v. Kleindienst, D.D.C.1972, 357 F.Supp. 779. In McMillan v. Carlson, *supra*, the plaintiff was an author seeking an interview to aid him in writing a biography of James Earl Ray. Permission was denied on the basis of the same policy statement challenged here. Judge Murray ruled for the plaintiff on the grounds that the defendant Carlson had not shown that a total ban was the only method of preventing anticipated problems or that the requested interview would cause specific security problems. Similarly, no such showings have been made by defendants in this case.

■ In our opinion, the analysis by our learned colleague in the *McMillan* case leading to his conclusion that Bureau Policy Statement 1220.1A "is an invalid restriction of First Amendment rights of freedom of speech" applies *a fortiori* to newspapers and reporters. The governmental interest in secure and orderly prison administration and the practical value of personal interviews are essentially the same, and we shall not undertake to duplicate or paraphrase Judge Murray's analysis. But the educational function of the press far exceeds that of the author of a biography; in all likelihood, a single edition of a metropolitan newspaper will have far wider circulation than a book about James Earl Ray. And the watchdog function of the press is unique. As with public institutions in every branch

---

5. Defendant Carlson apparently submitted an affidavit in that case similar, if not identical, to the one filed in this case.

of government, the press plays an invaluable watchdog function with respect to prisons, whose very nature imbues the press' function with heightened significance in comparison to other, more open institutions. As stated by Chief Judge Coffin in Palmigiano v. Baxter, 1 Cir. 1973, 487 F.2d 1280, 1283, with reference to procedural due process in prison disciplinary proceedings, "Most decision-making of correctional personnel is less visible to the public than is the decision-making of other public officials, and therefore less likely to benefit from the inherent constraints of public discussion and scrutiny."

The current need for news and stories about prison conditions and administration is discussed in a monograph, "Extending Public Understanding of Crime and Its Treatment", by Professor Albert Morris published in November 1973 by the Massachusetts Correctional Association, from which the following are excerpts:

"The maintenance of a decent and orderly society is the responsibility of the total community. To a limited extent it does this through agencies to which it allocates specific responsibilities for criminal law enforcement and the administration of criminal justice. The community sets the task of these agencies . . . . Greater public understanding of the objectives, procedures, and problems of law enforcement and criminal justice is, therefore, an essential basis for the ideological and financial support of desirable fundamental improvements in the system." (p. 1)

"When the daily news is supplemented with programs more specifically directed towards public education in the form of television documentaries, panel discussions, and in-depth interviews or through a series of newspaper articles based on surveys of police, courts or corrections the rough and ready educational effect of the media of public communication must be considerable; and it probably informs many who are not reachable by other methods." (p. 8)

"All indications are that the American public is not uninterested in, nor apathetic about, crime and its treatment. It is more probably confused. Information about criminal behavior and its treatment is often distorted and superficial and public reaction to crime and ways of dealing with it may be more largely emotional than rational. It does seem to be generally recognized that we are not dealing justly and effectively with the problem." (p. 19)

■ According to affidavits filed by plaintiffs, within the past several years the plaintiff newspaper has attempted to upgrade its coverage of the criminal justice system; coverage of news pertaining to prisons forms an important part of that effort; and accurate and complete coverage of news concerning prisons is virtually impossible if personal interviews with prisoners are flatly forbidden. The affidavits do not disclose any particular topic or subject matter of the requested interview with Clifford Irving. Presumably it will elicit his impressions of the federal correctional system, his personal background and its relation to his crime or politics, or the like. However, it is fundamental that freedom of the press does not depend upon the subject matter of the publication.[6]

■ While the First Amendment does not require that the press be given access to prisoners in all circumstances, the preclusion at issue here is absolute. It does not distinguish between maxi-

---

6. Generally the importance of First Amendment rights has not been measured by the content of the communication except for commercial messages, Valentine v. Chrestensen, 1942, 316 U.S. 52, 62 S.Ct. 920, 86 L. Ed. 1262, "fighting" words, Chaplinsky v. New Hampshire, 1942, 315 U.S. 568, 62 S. Ct. 766, 86 L.Ed. 1031, and obscenity, Roth v. United States, 1957, 354 U.S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498.

mum and minimum security prisons, between prisoners who have independent prominence and the obscure, nor between troublesome and model prisoners. The defendants' regulations additionally suffer from internal inconsistencies: visits allowed by political figures such as Congressmen and community action groups might cause more "big wheel" notoriety of the inmates visited and more demands upon undermanned staffs than visits by the press, yet their visits are not similarly curtailed. Finally, face-to-face interviews with prisoners are apparently allowed in the majority of state institutions and the dangers and inconvenience involved are apparently not considered sufficient by those officials to forbid such interviews. Washington Post Co. v. Kleindienst, *supra*, 357 F.Supp. at 774. They are permitted, for example, in Massachusetts. See Mass. Commissioner of Correction Bulletin 71–6 (Aug. 3, 1971).

Thus it does not appear that the defendants will be able to meet the burden established in Nolan v. Fitzpatrick, 1 Cir. 1971, 451 F.2d 545, 548, of demonstrating that "the regulation 'furthers an important or substantial governmental interest' and that 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" See United States v. O'Brien, 1968, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672; Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231. The denial of

the plaintiffs' First Amendment rights constitutes irreparable harm. See, e. g., Shuttlesworth v. Birmingham, 1969, 394 U.S. 147, 162–163, 89 S.Ct. 935, 22 L. Ed.2d 162 (Harlan, J., concurring); Freedman v. Maryland, 1965, 380 U.S. 51, 61, 85 S.Ct. 734, 13 L.Ed.2d 649. Moreover, since the Correctional Institution at Danbury and the half-way house in New York City where Clifford Irving is now lodged are minimum security facilities where prisoners are sometimes allowed to leave pursuant to various programs of rehabilitation, it is unlikely that the defendants will suffer any harm by the granting of preliminary relief. Such relief will not of course enjoin valid temporary refusals of interviews based upon emergencies or the requirements of prison discipline.

■ Accordingly it is ordered that pending final decision of this action the defendants Attorney General William B. Saxbe and Director Norman A. Carlson, their agents, servants, employees and attorneys are enjoined from enforcing Bureau of Prisons Policy Statement 1220.–1A, paragraph 4b(6) to the extent that it prohibits absolutely personal interviews by plaintiffs with Clifford Irving and other inmates[7] of the Federal Correctional Institution at Danbury and from refusing any reasonable request by plaintiffs for permission to interview Clifford Irving and other inmates at the Federal Correctional Institution at Danbury on the basis of said Policy Statement.[8]

7. The court's order applies to inmates other than Clifford Irving because plaintiffs have demonstrated an interest in seeking future interviews in line with their increased coverage of the criminal justice system and the likelihood that such future requests would also be refused by the defendants on the basis of the same Bureau of Prisons Policy Statement.

8. It is difficult to see why, in view of the court's findings and conclusions, the preliminary injunction should not be made permanent. Therefore, defendants are ordered to file on or before February 28, 1974 a memorandum of facts and law showing why a permanent injunction should not issue and summary judgment be entered for plaintiffs.